UNITED STATES of America, Plaintiff–Appellee,

v.

Robert MORALES, Defendant–Appellant.

No. 89–2053.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1990.
Decided May 21, 1990.

Thomas M. Durkin, John N. Gallo, Asst. U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Mark W. Solock, Patrick G. Reardon, Chicago, Ill., Robert Morales, Federal Medical Center, Rochester, Minn., for defendant-appellant.

Before POSNER, RIPPLE, and KANNE, Circuit Judges.

POSNER, Circuit Judge.

It is a federal crime for a person who has been convicted of a felony to possess a firearm that has been shipped in interstate or foreign commerce. 18 U.S.C. § 922(g)(1). And if, as in the case of appellant Robert Morales, the person has three or more previous convictions for a violent felony or a serious drug offense, the minimum sentence for the crime is fifteen years in prison, without possibility of parole. § 924(e)(1). That is the sentence Morales received, for he had four previous convictions—one for rape, one for attempted rape, and two for aggravated battery, and these are all violent felonies.

■ The appeal raises only one question that requires extended discussion: whether the district judge abused his discretion in turning down Morales' motion, made under Rule 33 of the Federal Rules of Criminal Procedure, for a new trial. *United States v. Reed*, 875 F.2d 107, 113 (7th Cir.1989); *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980). This rule provides that "the court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." Because the trial judge is in a better position than we to evaluate such a motion—he heard the witnesses and lawyers and watched the jurors as they listened to the evidence—the standard of appellate review is, as the cases cited indicate, a highly deferential one.

■ A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly. *United States v. Reed, supra*, 875 F.2d at 113; *United States v. Martinez*, 763 F.2d 1297, 1312–13 (11th Cir.1985).

But if the judge believes there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted—he· has the power to set the verdict aside, *United States v. Rothrock*, 806 F.2d 318, 321–22 (1st Cir. 1986), even if he does not think that he made any erroneous rulings at the trial. The existence of the power implies, in extreme cases anyway, a duty enforceable by an appellate court. Rule 33's conferral of discretion on the district court ("the court ... may grant") is not a license to abuse it. *Bryan v. United States*, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950); *United States v. Wiley*, 517 F.2d 1212, 1219–20 (D.C.Cir.1975); *United States v. Parks*, 460 F.2d 736, 745–46 (5th Cir.1972).

■ Did Judge Hart abuse his discretion in deciding that the evidence was sufficient to obviate serious concern that an innocent person had been convicted? He reached this conclusion only with hesitation. So troubled was he, indeed, that after turning down the motion for a new trial he asked the government (as if he were a French *juge d'instruction*) to conduct a further investigation of the crime, to make sure it had not prosecuted the wrong person. The government complied by sending a pair of Assistant United States Attorneys to the scene of the crime to look for the bullets that the Chicago police had failed to look for two years earlier, when the crime had been committed. Of course they found nothing.

The facts leading up to Morales' conviction are as follows. At midnight on the night of June 28, 1987, officer Richard Maher of the Chicago police was sitting in his squad car when he heard what sounded like a gunshot. According to his testimony at the trial, he glanced in the direction of the sound and saw, at a distance of 200 feet, an Hispanic man with raised arm. He then saw a flash of light and another gunshot. He followed the man into a nearby tavern, just seconds behind him, and saw him standing to the side of the bar and making an underhand tossing motion toward it. The officer arrested the man—Morales, as he turned out to be—and with the aid of another officer began looking for the gun. In one of the three sinks, each one foot square, behind and recessed under the bar, the officers found a semi-automatic pistol, a .25 caliber Armi Tanfaglio; in another they found a clip for the pistol, with five bullets in it. The clip for this type of pistol can hold seven bullets, and there is room for an eighth in the chamber. When the gun is fired, the recoil automatically loads a bullet from the clip into the chamber and cocks the trigger. (That is what makes it semi-automatic; if the trigger did not have to be pulled after each shot for the gun to keep on firing, the gun would be fully automatic.) So the chamber of the pistol found by the police in the sink should have contained a bullet, if the pistol had just been fired, but it did not.

The police did not check the gun for fingerprints, which might or might not have been obliterated by the water. Cf. Scott's Fingerprint Mechanics § 37, at pp. 122–25 (Olsen ed. 1978). They did not administer a gunshot-residue test to Morales to determine whether he had fired a gun recently. They did not look for (or find serendipitously) any spent shells, or the live round that had presumably—since the chamber was empty—been ejected from the chamber manually after being automatically loaded into it from the clip when the previous round was fired. And they did not interview the one customer at the bar, or even ask him his name. Federal officers eventually tested the gun to determine whether it was in working condition, and found that it was—making the absence of a round in the chamber all the more puzzling.

The owner of the bar testified that she was cleaning up with the aid of an employee, preparatory to closing, when Morales entered. She testified that she saw him standing next to the bar, a foot away from her, but did not see him throw anything. She denied that either she or her employee had a gun.

Officer Maher was the key witness for the prosecution. His partner in the squad car did not testify, even though the government had sought and obtained a continuance to enable him to do so. Although

Maher testified to hearing two shots, his police report mentioned only one. Although he testified to being 200 feet from Morales when the shots were fired, at the preliminary hearing he had testified that he was 500 feet away. In the police report and at the preliminary hearing he had stated that Morales had run into the tavern, but at the trial he testified that Morales had walked into it. In the police report he had stated that he arrested Morales only after finding the gun, a sequence that suggests he may not have been confident that he had tracked the shooter to the bar. But at trial he testified that he arrested Morales first, and then looked for and found the gun.

■ The preliminary hearing was in a state court, because Illinois, too, has a law punishing convicted felons for possession of firearms. But upon discovering that the maximum sentence that Morales could receive under Illinois law was five years (of which he would have to serve only two and a half years if he behaved himself in prison), the U.S. Attorney decided to prosecute Morales under federal law, where if convicted Morales would receive a minimum sentence of fifteen years without possibility of parole, although good-time credits could reduce it to thirteen years. 18 U.S.C. § 3624. What the *federal* interest is in punishing the possession of a firearm by a person convicted of Illinois felonies escapes us, but is not our business. The existence of federal jurisdiction is not in doubt (the out-of-state origin of the gun is conceded), and we do not review the exercise of prosecutorial discretion. *United States v. Schwartz*, 787 F.2d 257, 266 (7th Cir.1986); *United States v. Podolsky*, 798 F.2d 177, 179 (7th Cir.1986); *United States v. Miller*, 891 F.2d 1265, 1271–72 (7th Cir.1989) (concurring opinion).

The investigation of the incident by the Chicago police was extraordinarily sloppy (perhaps because the police did not think they were investigating a serious offense), and by the time the federal authorities became interested in the case it was too late to conduct a reasonable investigation. The spent shells and live bullet (if any) had

disappeared. The unknown customer in the bar had disappeared. The fingerprints on the gun had disappeared. It was too late to conduct a gunshot-residue test. We are left with a case that is full of puzzles. Officer Maher's description of what he saw when he entered the tavern—Morales making an underhand toss of some object toward the bar—is hard to reconcile with the tavern owner's testimony. She testified that she saw no tossing motion and heard no splashes, even though it appears the bar was quiet—it was about to close and there was only one customer. Maher's testimony is also hard to square with the physical evidence. He said he watched Morales with an eagle eye from the moment he fired the second shot, but did not see him remove the clip. Why *would* Morales remove the clip while trying to escape from the police? And, having done so, did he really toss both pistol and clip in a single motion, and if so how did they end up in separate sinks? The sinks protrude only four inches from beneath the bar. If Morales did not toss the gun and the clip in a single motion, doesn't this mean that Maher lost sight of him, for a time anyway, as Maher's police report suggests? And if Morales had fired one or two shots, why was there no bullet in the chamber, since the clip still held several bullets and the gun was later found to be in working order? Did Morales both remove the clip and manually eject the live round that would have been chambered by the firing of the gun? Why on earth would he do those things?

Life is full of surprises. Officer Maher's story is not impossible, just improbable. And it is only a confusion between ex ante and ex post probabilities that might make one think that the government could never prove a person guilty beyond a reasonable doubt of an improbable crime. The probability that X could shoot Y between the eyes from a thousand paces might be one in a million before X pulled the trigger, but once Y shows up with a bullet hole between the eyes the probability that X is the author of this improbable wound shoots up, and that is the probability that is relevant to the issue of guilt. Returning to our case, the gun and the clip were found,

*mirabile dictu,* in separate sinks; it was no doubt improbable that they should land there; yet there they were—a fact the existence of which Morales does not contest—and the probability that he put them there is a good deal higher than, say, the probability that he would lob them there successfully in the first place (if that is what happened). The issue becomes: not was it highly likely beforehand that a sequence such as that described by Officer Maher would actually occur, but, given that the gun and clip were found in the sinks, was the prosecution's hypothesis as to how they got there substantially more probable than the hypothesis that someone other than Morales put them there? If so, the jury was warranted in finding Morales guilty.

But on the present record, the government's hypothesis may not, in fact, be substantially more probable than the alternative hypothesis, advanced by Morales, that the tavern owner or her employee, seeing police enter the tavern, arrest Morales, and begin looking (initially on the floor) for a gun, slipped a gun and its clip, perhaps kept on a shelf behind the bar, into the sinks that protruded from beneath the bar. It is difficult to obtain a gun permit in Chicago, and neither the tavern keeper nor her employee had one. The gun was registered, but not to anyone having a known connection either to Morales or to the tavern owner or her employee. It is common knowledge that many Chicagoans—and in particular the owners of retail establishments in tough neighborhoods and especially the owners of bars in those neighborhoods—own guns for self-defense, for which they have no permit. The fact that no bullet was found in the chamber supports the defense's theory, for normally the chamber would be empty unless the gun had been fired recently. However, semiautomatic pistols jam frequently, meaning that the recoil fails to chamber a round from the clip. Wallack, American Pistol & Revolver Design and Performance 51–53 (1978); Bearse, Sporting Arms of the World 376 (1976). This is especially true of a cheap semi-automatic, like the Tanfoglio. Hogg & Weeks, Pistols of the World 238 (1978). In making these observations we

stray outside the record—but only to underscore its incompleteness.

If the prosecution's theory and the alternative theory were equiprobable or close to it, Morales would have to be acquitted (and one of his alternative grounds for appeal is that the district judge should have granted his motion for an acquittal). They are not, for on the government's side of the balance is the testimony of Officer Maher that he saw Morales shoot the gun and then enter the tavern. Such evidence might well have justified a finding of guilt beyond a reasonable doubt even if the gun had never been found. Certainly it tips the balance of probabilities in favor of the government. But it is undermined not only by the physical evidence, but also by the inconsistencies in Maher's accounts of the incident, making it quite possible though not highly probable that Morales was not the man whom Maher saw, or thought he saw, shoot a gun.

■ Because Maher's testimony was not inconsistent with physical reality or otherwise incredible, the judge could not, under our recent decision in *United States v. Kuzniar,* 881 F.2d 466, 471 (7th Cir.1989), have excluded the testimony from the trial on the ground of its probably being false, or have ordered a new trial because he had failed to exclude it. When, however, in a case in which a jury has convicted a person of a crime carrying a very long mandatory minimum penalty, the complete record, testimonial and physical, does not permit a *confident* conclusion that the defendant is guilty beyond a reasonable doubt, the district judge is obliged to grant a motion for a new trial. This was such a case; "it would be a manifest injustice to let the guilty verdict stand." *United States v. Reed, supra,* 875 F.2d at 114.

In so concluding, we do not succumb to the fallacy that every retrial is a better stab at truth-finding than the previous trial. But in the present case the next trial is likely to be better in this respect than the first one. The government will have an incentive to do more investigating, for example of the likelihood that the gun, while in working order, jammed when fired and therefore did not chamber a new round;

and the lawyers on both sides will be more practiced in presenting the facts to the jury. The better the lawyers at a trial are, provided they are evenly matched, the more likely is the trier of fact to find the truth. If a jury—a different jury, of course—unanimously convicts Morales a second time, the district judge and this court will have much greater grounds for confidence that the right man was prosecuted.

■ The standard for new trials in Rule 33 of the criminal rules is the interest of justice, and it comprehends the interests of the law-abiding as well as those of possibly guilty defendants. The interests are accommodated one to the other by our ruling that Morales is entitled not to an acquittal, but only to a new trial at which the prosecution will have a chance to mount a stronger case and Morales a stronger defense. The result will be a slight added expense of prosecution but also a proceeding much more likely to render a verdict in which the legal system and the public can have confidence. If in a civil case the trial judge orders a new trial under Fed.R.Civ.P. 59(a) because the verdict was against the manifest weight of the evidence, and retrial results in a verdict for the same party, that verdict shall (save in exceptional circumstances) stand. *Massey–Ferguson Credit Corp. v. Webber*, 841 F.2d 1245, 1250 (4th Cir.1988); 11 Wright & Miller, Federal Practice and Procedure § 2803, at p. 35 (1973). A similar principle guides our approach in this criminal case. *United States v. Wiley, supra*, 517 F.2d at 1220.

The judgment of conviction is reversed with instructions to grant the defendant a new trial.

So Ordered.