**UNITED STATES of America, Appellee,**

v.

**Brian A. PETTIFORD, Defendant, Appellant.**

**No. 91–1553.**

United States Court of Appeals, First Circuit.

Heard March 2, 1992.

Decided March 9, 1992.

As Amended May 5, 1992.

Dwight M. Hutchison, Quincy, Mass., by Appointment of the Court, for defendant, appellant.

Mark W. Pearlstein, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for U.S.

Before TORRUELLA, Circuit Judge, CAMPBELL and WEIS,* Senior Circuit Judges.

PER CURIAM.

Following a jury trial in the United States District Court for the District of Massachusetts, defendant Brian Pettiford was convicted of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Pettiford appeals on the grounds that (1) the district court should have granted his motion for acquittal because of insufficient evidence, (2) the district court abused its discretion in failing to allow the jury to view the scene of Pettiford's arrest, and (3) the district court

* Of the Third Circuit, sitting by designation.

erred in denying his motion for a new trial based on newly discovered evidence. We affirm.

### 1. *Motion for Judgment of Acquittal*

Pettiford and one David Lewis were arrested in Joe's Pizza Shop in Roxbury, Massachusetts on April 30, 1990. A firearm was found on Lewis' person, and another firearm was found in a trash can near which Pettiford was standing. Besides Pettiford and Lewis, two other people were in the customer area of the shop. Pettiford moved for a judgment of acquittal, both at the close of the government's case and at the close of all the evidence, claiming there was insufficient evidence from which to conclude that he possessed the second firearm.

The district court denied Pettiford's motions for acquittal. We review this denial by determining whether, " 'after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Barnes*, 890 F.2d 545, 549 (1st Cir.1989), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in *Jackson*).

■ Boston Police officers Daniel Thompson, George Finch and John Connor testified for the prosecution. Thompson testified that, on April 30, 1990, he received a radio report of "two men with a gun" near Dudley Station in Roxbury, Massachusetts. According to Thompson, the report further stated that "two gentlemen fitting that description walk[ed] into a sub shop."[1] The other two officers gave similar descriptions of the report. In addition, officer Brian Fleming, called by the defense, testified as to the transcript of the radio report. Fleming testified that the transcript described one of the men as "wearing a blue and white sweat suit" and the other as "wearing a black leather jacket," which is what Lewis and Pettiford were wearing, respectively. The transcript was introduced into evidence by the defense.

Officer Finch testified that, after receiving the radio report, he, Fleming and officer Daniel Linskey entered the pizza side of the sub shop with their guns drawn and demanded that everyone raise their hands and get against the wall. The other two officers, Thompson and Connor, followed them within seconds. Finch described the position of the customers in the shop as follows. On the opposite side of the room from the door and slightly to the left was a man in a blue and white sweat suit standing against the counter eating a slice of pizza. To the right of the door, in the front corner of the room were two men. Standing between those two men and the door was a fourth man, identified as defendant Pettiford. Defendant was about a foot or two from a trash can in which a pistol was later discovered. He was the only person identified as wearing a black leather jacket.[2]

Officer Thompson testified that he entered the shop a few seconds after the first three officers. Before entering the shop he saw the following through the window.

> One male slightly had his body half turned towards the window area where his face was looking out towards the Dudley Street side and he made a backward motion with his hand. As he was bringing it up, I believe he dropped something, to me it appeared to be a black object, from his hand as he was bringing his hands up forward.

This man, whose profile Thompson could see and whom Thompson identified as defendant, was wearing a black leather jacket.

When Thompson entered the shop, he helped the other officers restrain the man in the blue and white sweat suit (Lewis), who had refused to put up his hands and get against the wall. The officers found a

---

1. It seemed accepted by all witnesses that Joe's Pizza Shop, which apparently contained both a sub shop and a pizza shop, was the sub shop referred to.

2. Officers Finch and Thompson testified that, of the two men besides Pettiford and Lewis, one was wearing a reddish jacket. They could not recall what the other was wearing.

firearm on his person. After the situation was under control, Thompson saw another officer holding a gun he had found at the scene. Thompson pointed to Pettiford and said, "Check that guy. He was closest to the trash can."

Officer Connor testified that, when he entered the pizza shop, he looked inside the trash can and found a handgun. He searched the trash can because he was looking for a weapon, there being "no other obvious place where it might be." The trash can was about a quarter full and there were no other black objects in it. On cross-examination, he testified he could not recall that any other officer had said anything in response when he exclaimed that he had found a gun in the trash can.

In addition to this testimony, photographs of the shop were admitted into evidence, and the officers used the photographs to describe the position of the people in the shop. Thompson was cross-examined about the exact position from which he claimed to have seen the black object. No fingerprints were taken off the handgun, and it had not been fired. No evidence was presented by the government as to whether Lewis' gun had been fired, although the radio transcript indicated that shots had been fired earlier.

We think that a rational jury could have concluded from this evidence that Pettiford possessed the gun in the trash can. It was the jury's province to decide whether to believe officer Thompson, *see United States v. Green*, 887 F.2d 25, 28 (1st Cir. 1989) ("assessing the credibility of witnesses is solely the province of the trier of fact"). If the jury did believe Thompson, then it was a reasonable inference that the "black object" thrown by Pettiford was the handgun thereafter found by officer Con-

nor in the trash can. This inference would have been strengthened by Finch's testimony that Pettiford was standing closest to the trash can. Finally, the possibility that Pettiford was an innocent bystander was reduced by the evidence that he and Lewis fit the descriptions of the men alleged to have fired shots earlier who were traced to the pizza shop.

### 2. *Jury View*

At a pretrial conference, Pettiford asked the district court to allow the jury to view the pizza shop. The court expressed skepticism about the need for a view, and Pettiford never made any showing of need to support the motion before or during trial. On March 7, 1991, after the trial had concluded, Pettiford filed a motion for a new trial based on the court's failure to allow a jury view. The court denied the motion on two grounds. First, the court found that the view would not have "presented any clearer view of the evidence than was achieved through the use of photographs" at trial. Second, the court found that it would be "inappropriate" to allow the motion when the defendant had not followed up on his initial request with a showing of need before trial.

The decision to permit a jury view is committed to the sound discretion of the district court. *United States v. Passos–Peternina*, 918 F.2d 979, 986 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1637, 113 L.Ed.2d 732 (1991). We have examined the photographs of the scene and see no possible abuse of discretion by the district court in denying the view.[3]

### 3. *Newly Discovered Evidence*

On May 1, 1991, Pettiford moved for reconsideration of the court's denial of

---

3. On March 28, Pettiford submitted a supplemental memorandum in support of his motion for a new trial directing the district court's attention to *United States v. Morales*, 902 F.2d 604 (7th Cir.1990). In *Morales* the defendant was convicted of being a felon in possession of a firearm under circumstances similar to those at issue here. A police officer claimed to have seen the defendant fire a gun, run into a bar and make an underhand tossing motion. A gun was retrieved from a sink on the other side of the bar, and an ammunition clip was recovered from an adjacent sink. The Seventh Circuit

granted defendant's motion for a new trial, concluding that the government's investigation had been incomplete and the evidence against the defendant was weak.

Despite some factual similarities, we do not think *Morales* would mandate a new trial in this case for several reasons. First, the district court in *Morales* was disturbed by the verdict, and ordered the government to conduct a supplemental investigation. Second, the physical evidence in *Morales* was questionable, . as it was unlikely the defendant would have taken the time to separate the ammunition clip from the

his motion for a new trial. This motion was based on newly discovered evidence which was summarized in the affidavit of Julio Vasquez. Vasquez stated that he had been in the pizza shop that day and "observed [Pettiford] ... as [the] officers ordered [him] to get against the wall" but did not see Pettiford throw anything.[4]

The district court denied the motion, finding that the new evidence would not result in an acquittal. *See United States v. Natanel*, 938 F.2d 302, 313 (1st Cir.1991) (to grant motion for new trial based on newly discovered evidence, court must conclude that evidence "will probably result in an acquittal upon retrial of the defendant"). The district court's denial of the motion may be reversed on appeal only for abuse of discretion, *id.*, and we find no such abuse here. The prosecution's case was based on the proximity of Pettiford to the trash can and the testimony of officer Thompson, who saw Pettiford from *outside* the shop. Officer Finch, who was inside the shop, never testified that he saw Pettiford throw anything. Vasquez did not state that he kept his attention constantly focused on Pettiford, but merely that he "observed" him. The situation inside the shop was chaotic, and evidence that Vasquez "observed" Pettiford but did not see him throw anything would have had little bearing on Pettiford's possession of the gun, given that chaotic situation. We find that the district court did not abuse its discretion in concluding, after hearing all the evidence, that Vasquez's testimony would not have resulted in an acquittal.

The conviction is *affirmed.*

gun and throw the two into separate sinks. Third, the defendant in *Morales* articulated a plausible alternative theory as to how the gun got into the sink. He argued that the bar owner, who was standing a foot away from the defendant, had placed it there when the police came in. The gun was unregistered, and the owner wanted to be able to claim that it belonged to the defendant in case it was found by the police. None of these factors are present in the instant case, and we do not think *Morales* would mandate a new trial even if this circuit decided to follow that case.

4. Vasquez's affidavit also stated that the trash can was metal, not rubber as had been claimed by the officers, and that he heard no loud noise when the gun was allegedly thrown into the trash can. The affidavit of Jose Tigueroa also stated that the trash can was metal. Given the commotion in the pizza shop, and the fact the can was partially filled with soft debris, however, Pettiford's counsel understandably made little of the metal/rubber argument, and we see nothing in it.