UNITED STATES, Appellee,

v.

Alfredo NUEVA, Defendant, Appellant.

No. 91–2150.

United States Court of Appeals,
First Circuit.

Heard July 29, 1992.
Decided Nov. 4, 1992.

Raymond Rivera, by Appointment of the Court, with whom J.C. Codias was on brief, for defendant, appellant.

Jose A. Quiles, Asst. U.S. Atty., with whom Daniel F. Lopez–Romo, U.S. Atty. and Warren Vazquez, Asst. U.S. Atty., were on brief, for appellee.

Before SELYA and STAHL, Circuit Judges, and SKINNER,* District Judge.

STAHL, Circuit Judge.

Defendant-appellant Alfredo Nueva appeals his conviction[1] on charges of conspiracy to import a controlled substance into the United States and possession with intent to distribute a controlled substance in a vessel within the customs waters of the United States. In so doing, Nueva argues: (1) that his trial jury was presented with evidence legally insufficient to convict him;

and (2) that the bias of the trial judge violated his right to a fair trial and to effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution. Finding neither argument persuasive, we affirm.

*Factual Background*

We summarize the evidence in the light most favorable to the government. *United States v. Abreu,* 952 F.2d 1458, 1460 (1st Cir.), *cert. denied* —— U.S. ——, 112 S.Ct. 1695, 118 L.Ed.2d 406 (1992). The events leading up to Nueva's prosecution began in late November 1990, when Nueva, a Miami, Florida resident, contacted one Briant Rodriguez in Puerto Rico, in response to the latter's advertisement of a speedboat for sale. This inquiry was made despite the fact that such boats are generally more expensive in Puerto Rico than those available in Florida. Nueva told Rodriguez that he desired to test the boat. In order to do so, Nueva paid the boat's one hundred dollar registration fee and a two thousand dollar deposit to Rodriguez. Nueva, accompanied by co-defendants Berrios–Colon and Gonzalez, launched the boat from Palmas del Mar, Puerto Rico some time after 5:15 p.m. on December 5, 1990.[2]

Early that evening, United States Customs authorities were beginning to act on information they had received regarding a narcotics air drop that was expected that night in the waters east of Puerto Rico. In anticipation, Customs Special Agent Hector Marte deployed two Customs speed boats to the expected drop area, one of which he was to occupy for the duration of that evening's events. In addition to the two Customs boats, five law enforcement aircraft eventually became involved in this drug interdiction operation—two Customs

* Of the District of Massachusetts, sitting by designation.

1. Nueva was convicted along with two co-defendants, Vicente Joaquin Gonzalez and Hector Berrios Colon. Due to the fact that Gonzalez and Colon did not timely file their respective notices of appeal, a panel of this Court dismissed their appeals for lack of jurisdiction via judgments entered May 8, 1992. Thus, only Nueva's case is presently before us.

2. Trial testimony indicates that appellant's first attempt to launch the boat at 5:00 p.m. from a marina in Palmas del Mar was thwarted by that facility's imminent closure for the day. However, the marina's president testified to seeing co-defendant Colon in a pickup truck hauling the boat on a trailer at about 5:15 p.m. near the marina. The boat's empty trailer was later found in Palmas del Mar. Thus, there was an evidentiary basis for concluding that the boat was launched from that area.

Nomad aircraft ("Omaha 28" and "Omaha 05"), a Coast Guard Falcon jet, a Customs Cessna Citation jet, and a Coast Guard Dolphin helicopter. In addition, the Coast Guard deployed a United States Navy hydrofoil to the suspected drop site, while an Air Force Airborne Warning and Control Systems (AWACS) plane surveilled the entire scene. The Nomads were equipped with Forward Looking Infrared Radar (FLIR). While FLIR operates much like a camera, it does not take photographs, but instead captures images by measuring the difference in temperature between particular objects and their surroundings. As a result, the FLIR enables the Nomad crew to "see" activities taking place in the dark. In addition, "FLIR-ed" images can be videotaped, as was done in this case.

At approximately 6:30 p.m. Omaha 28 was ordered[3] to fly from the Borinquen Air Base in Aguadilla, Puerto Rico—near the northwestern corner of the island—to an area off the southern coast near Ponce. The Omaha 28 crew had been advised that other law enforcement aircraft had observed and targeted a suspect aircraft, flying on a northeasterly course from South America toward the Puerto Rico coast. At about 8:25 p.m., Omaha 28, using the FLIR, spotted the suspect aircraft flying eastbound at low altitude, without lights, within a mile or two of Puerto Rico's southern coast. Omaha 28 followed the suspect plane to an area off the southeast coast of the island, at which point both the pilot and co-pilot observed, unaided by the FLIR, spotlights from below flashing on the water. The spotlight flashes were immediately followed by flashes from the target plane's strobe light. Omaha 28 continued to follow the suspect aircraft over the area where the crew had seen the spotlights, and saw, via FLIR, the plane fly over a boat (hereinafter "the suspect boat") and then begin to circle. Soon thereafter, an object was seen being dropped from the suspect plane, a splash was observed near the suspect boat, and Omaha 28's pilot and co-pilot were able to see "chemical lights" floating on the water.[4] As Omaha 28 began orbiting over the area of the suspect boat and chemical lights, crew members used the FLIR to see the suspect boat moving in the direction of the chemical lights. They next saw three individuals on the boat retrieving objects from the water. Meanwhile, a different Customs plane followed the suspect aircraft away from the scene in a south-southwesterly direction. The suspect plane was tracked by radar and found to be headed toward Colombia.

Omaha 28's pilot then directed three law enforcement boats—the hydrofoil and the two Customs speedboats—to the specific area of the drop. As the hydrofoil neared the site, its crew illuminated a navigation light to better enable Omaha 28 to direct it, while Omaha 28 did the same, in order to be more visible to all other law enforcement air and sea craft. When the various navigation lights went on, the Omaha 28 crew observed, through the FLIR, people on board the suspect boat dropping articles into the water. After some thirty-five minutes, during which the suspect boat attempted to evade the hydrofoil, the Coast Guard helicopter was able to capture the suspect boat in a spotlight. The Customs boats were then able to see and intercept the suspect boat. The hydrofoil was then directed to the area where the chemical lights had previously been seen in the water, where Omaha 5 had been orbiting during the interception of the suspect boat. The hydrofoil located and retrieved five bales from the water, to which chemical lights were attached. Each bale contained an identical inscription, "32ORO." A field test on the contents of one of the bales

---

3. Three Omaha 28 crew members testified at trial: pilot Mark Jackson, co-pilot Gary Sparrow, and air interdiction officer John Anderson, who also served as the government's "interpreter" of the FLIR videotape shown to the jury. As herein described, the account of Omaha 28's activities is a composite of the crew members' testimonies.

4. As described by various witnesses, a chemical light is a small glass or plastic tube, which contains chemicals separated by an inner tube. Bending the outer tube breaks the inner tube, allowing the chemicals to mix and create light.

yielded positive results for cocaine.[5]

Meanwhile, Special Agent Marte, aboard one of the Customs boats, boarded the suspect boat. Appellant Nueva, after identifying himself as the captain, said he was testing the suspect boat. Co-defendant Berrios–Colon stated that he was a crew member, while co-defendant Gonzalez reported that he had observed an aircraft throwing packages into the water. Although the suspect boat's engine was hot to Agent Marte's touch, indicating that it had been recently functioning, it would not start and had to be towed, along with its "crew," to shore.[6]

In the early hours of December 6, 1990, the three men were arrested. Two weeks later, a grand jury indicted each of them on two counts: Count I, conspiracy to import approximately 199 kilograms of cocaine into the United States from a place outside thereof, in violation of 21 U.S.C. §§ 952, 960 and 963; and Count II, aiding and abetting each other in the knowing and intentional possession of cocaine, with the intent to distribute the same, while on board a motor vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. app. § 1903(a), (c)(1)(D)[7] and 18 U.S.C. § 2. At trial, defendants argued that they were simply in the wrong place at the wrong time—stranded at sea in a boat with a failed engine—while the intended recipients of the cocaine escaped into the night. The jury found otherwise, convicting all three men on both counts. Appel-

lant Nueva was sentenced, *inter alia,* to twenty years in prison.

### Appellant's Claims

#### I. Sufficiency of the ·Evidence

■ Our standard of review when faced with a challenge to the sufficiency of the evidence is a familiar one. We must "look[ ] to the evidence as a whole, including all reasonable inferences drawn·from it, in the light most favorable to the verdict, to determine whether a rational trier of fact *could* have found the defendant guilty beyond a reasonable doubt." *United States v. Plummer,* 964 F.2d 1251, 1254 (1st Cir.1992) *cert. denied,* — U.S. —, 113 S.Ct. 350, 121 L.Ed.2d 265 (1992) (emphasis added); *United States v. Lopez,* 944 F.2d 33, 39 (1st Cir.1991). Moreover, the prosecution need not exclude every reasonable hypothesis of innocence, so long as the total evidence permits a conclusion of guilty beyond a reasonable doubt. *Plummer,* 964 F.2d at 1255 (quoting *United States v. Hilton,* 894 F.2d 485, 487 (1st Cir.1990)). Finally, and especially relevant to the case at bar, all issues of credibility must be resolved in favor of the verdict. *Id.* at 1254.

■ To prove Nueva guilty of Count I, the·government had to show the existence of a conspiracy—that is, an agreement to commit the substantive offense coupled with the intent to do so—plus Nueva's knowing and voluntary participation in it. *United States v. Rodriguez Cortes,* 949 F.2d 532, 538 (1st Cir.1991). In order to

---

**5.** A second field test and subsequent laboratory analysis reached the same conclusion.

**6.** A later engine inspection revealed traces of water in the spark plug and cylinder areas, a condition which would cause the engine to run sporadically, according to the testimony of a Coast Guard machinery technician. Further testimony indicated that the engine problems could have been prevented by the presence of a one-way valve in the exhaust system to prevent water from backing up into the engine, but that most speedboats do not normally have such a valve because of the high speeds at which they usually operate. The technician suggested that a combination of a heavy load, high seas, and a slow operating speed could have led to this particular malfunction. This conclusion sup-

ported the government's theory that the suspect boat had stopped while waiting for the drop, and then maneuvered slowly to retrieve the bales from the water.

**7.** The indictment makes separate references to "section 1903(a)(c)(1)(D)"· and "section 1903(1)(c)(1)(D)." For clarity's sake, we note that no ":section 1903(1)" exists. Subsection (a), however, makes it illegal "for any person on board a ... vessel subject to the jurisdiction of the United States ... to possess with intent to manufacture or distribute a controlled substance," while subsection (c)(1)(D) defines such a ·vessel as one "located within the customs waters of the United States." Therefore, we assume the reference to· "section 1903(1)(c)(1)(D)" was inadvertent.

prove that Nueva belonged to and participated in the conspiracy, the government had to prove that he intended to agree and that he intended to commit the substantive offense. *Id.*, (*citing United States v. Rivera–Santiago*, 872 F.2d 1073, 1079 (1st Cir. 1989)). The substantive offense, importation of a controlled substance into the United States, requires proof that the "defendant [conspired to bring] cocaine into the country from international waters or from airspace in excess of twelve geographical miles outward from the coastline." *United States v. Goggin*, 853 F.2d 843, 845 (11th Cir.1988) (citation omitted). The agreement to import may be express or tacit, may be proven by direct or circumstantial evidence, and the government need not prove that the defendant knew all the details or all the members of the conspiracy. In the end, it is sufficient for the government to prove the essential nature of the plan and the defendant's connection with it. *Id.* (citations and quotations omitted).

■ As outlined above, the government's evidence first showed Nueva travelling from Miami to Puerto Rico to purchase the suspect boat, even though testimony indicated similar boats are generally available and less expensive in Florida. Next, he and his co-defendants launched the suspect boat in the late afternoon, eventually winding up in an area where a plane coming from South America was making a narcotics drop. Further, just prior to the drop, the suspect boat apparently signalled the suspect plane, which signalled back. Significantly, except for these two signal bursts, both the plane and the boat were operating entirely without lights. Viewing the FLIR tape, aided by Officer Anderson's interpretation, the jury saw the drop being made and the suspect boat's retrieval and subsequent disposal of the cocaine bales.

The defense, in addition to trying to impeach government witnesses via various purported inconsistencies in their stories, put their own FLIR expert, Robert Abend, on the stand. As could be expected, his interpretation of the FLIR videotape contrasted sharply with that of Anderson. He concluded that other boats appearing on the tape—those which the government contended were the Customs boats—were supposed to receive the drug shipment, but were scared off by the presence of the numerous law enforcement assets. He also testified that the "articles" seen on the FLIR tape were not bales of cocaine.

■ Against this legal and factual landscape, appellant's sufficiency argument runs aground. Throughout the nearly sixty pages of appellate brief devoted to this subject, appellant does little more than highlight and rehash the arguments made at trial relative to the credibility of the governments' witnesses. In essence, appellant appears to argue here, as he did below, that simply because the defense posited a story at odds with that of the government, a jury must necessarily have reasonable doubt as to defendant's guilt. This is a plainly incorrect formulation. *See, e.g., United States v. Pettiford*, 962 F.2d 74, 76 (1st Cir.1992) ("It was the jury's province to decide whether to believe [the government's witness]"); *United States v. Torres*, 960 F.2d 226, 228 (1st Cir.1992) ("The jury, however, was legally free to reject [defendant's] contrary story."). While it is true that the jury *could* have been swayed by the combination of defense evidence and extensive cross-examination of government witnesses, acquittal was not the only rational outcome. The jury could have discerned an agreement to import and Nueva's participation in it based on his travelling to purchase the suspect boat, the early evening launch, the exchanged signals between the boat and the plane inbound from South America, and appellant's participation in retrieving the just-dropped contraband. Accordingly we find the evidence sufficient to support Nueva's conviction on Count I.

■ Count II requires less discussion. The jury members apparently chose to accept Anderson's interpretation of the FLIR videotape rather than Abend's. This, as has been explained *ad infinitum*, they were free to do. Of course, they may have also accepted neither expert's explanation, instead relying solely upon their own senses to evaluate the tape. In either case,

the evidence was sufficient to demonstrate that appellant possessed the cocaine here at issue. Moreover, a jury may infer an intent to distribute cocaine based on possession of amounts too large for personal consumption. *See, e.g., United States v. Vargas,* 945 F.2d 426, 428–29 (1st Cir.1991) (possession of one kilogram enough to support inference of intent to distribute). Therefore, appellant's possession, however brief, of nearly two hundred kilograms of cocaine is sufficient to support a conclusion of intent to distribute. Accordingly, we reject his sufficiency argument as to Count II.

## II. Judicial Bias

■■■■■ It cannot be gainsaid that "[a] fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). Here, however, we find appellant's assertion of bias to be totally unfounded. In support of his argument, appellant essentially revisits every unfavorable trial ruling and comment from the bench, stacks them up, and concludes that the trial court "enhanced the finding of a guilty verdict where there was no independent evidence" of Nueva's guilt.

In the first place, we have already detailed the government's evidence, which we have found sufficient to support conviction. Next, we find it curious that appellant does not argue that any of the allegedly erroneous rulings constituted harmful error.[8] Finally, although our review of the approximately one thousand pages of trial transcript reveals numerous instances where the trial judge questioned witnesses or criticized counsel, we note the following portion of the court's closing instructions:

> During the course of this trial, I occasionally have asked questions of witnesses, in order to bring out facts which are not then fully covered in the testimony,

do not assume that I hold any opinion on the matters oh [sic] to which my questions were addressed. Remember at all times that you are [sic] the jurors are at liberty to disregard all the comments that I may have made in arriving at your own finding of the facts.

This cautionary direction was enough to forestall any potential prejudice created by any of the judge's comments or questions. *See, United States v. Quesada–Bonilla,* 952 F.2d 597, 601 (1st Cir.1991) (finding similar instructions adequate to refute claim of bias based on trial judge's comments).

"A finding of partiality should be reached only 'from an abiding impression left from a reading of the entire record ...'" *United States v. Twomey,* 806 F.2d 1136, 1140 (1st Cir.1986) (quoting *Offutt v. United States,* 348 U.S. 11, 12, 75 S.Ct. 11, 12, 99 L.Ed. 11 (1954)). We have read the entire record and are left with no such abiding impression.

*For the foregoing reasons, appellant's conviction is affirmed.*

---

**8.** It is true that appellant's reply brief and counsel at oral argument asserted that the trial court's exclusion of a tracklog—purportedly a detailed compilation of law enforcement activity on the night in question—was harmful error. However, arguments raised for the first time in a reply brief or oral argument are insufficient to

preserve a claim for appeal. *Frazier v. Bailey,* 957 F.2d 920, 928 n. 14 (1st Cir.1992) (citing *Pignons S.A. de Mecanique v. Polaroid Corp.,* 701 F.2d 1, 3 (1st Cir.1983) ("In preparing briefs and argument, an appellee is entitled to rely on the contents of an appellant's brief for the scope of the issues appealed....."))