**UNITED STATES of America, Appellee,**

v.

**James A. CROCHIERE, Appellant.**

**No. 97–1555.**

United States Court of Appeals,
First Circuit.

Heard Oct. 10, 1997.

Decided Nov. 18, 1997.

Marc D. Padellaro, Cambridge, MA, with whom Joseph W. Monahan, III and Mary Jane Walsh were on brief, for appellant.

S. Theodore Merritt, Assistant United States Attorney, Boston, MA, with whom Donald K. Stern, United States Attorney, was on brief, for appellee.

Before STAHL, Circuit Judge, CYR, Senior Circuit Judge, and LYNCH, Circuit Judge.

LYNCH, Circuit Judge.

James A. Crochiere, a correctional officer at the Worcester County Jail and House of Correction, was indicted on charges of violating and conspiring to violate the civil rights of a pre-trial detainee at the jail. *See* 18 U.S.C. §§ 2, 241, 242. Crochiere was charged with the act of and conspiracy to pour boiling water on the groin and upper thigh of Jose Nieves, who had been arrested on the charges of murdering a young girl. A jury found Crochiere guilty of the conspiracy count and acquitted him of the substantive count.

Crochiere makes three arguments on appeal. He challenges the district court's denial of his motion for a jury view of the scene of the crime. He contends that a portion of the district court's jury instructions on the conspiracy count was erroneous in that the instructions charged that no "overt act" is required under the criminal civil rights conspiracy statute, 18 U.S.C. § 241. He also argues that the evidence was insufficient to convict him on the conspiracy count. We affirm and hold that 18 U.S.C. § 241, the civil rights conspiracy statute, does not require an overt act.

I.

We state the facts in the light most favorable to the verdict. *See United States v. Montas,* 41 F.3d 775, 778 (1st Cir.1994). On April 18, 1993, Jose Nieves was brought to the jail to await trial on charges that he murdered a twelve year old girl. Nieves, a heroin addict who was undergoing detoxification, became highly agitated and unruly, banging his head against the bars of his cell. Nieves cut open his forehead. Several correctional officers, Crochiere among them, came to Nieves's cell to restrain him. The officers handcuffed Nieves and strapped him into a restraint chair. Nieves strongly resisted; the officers placed a blanket over Nieves's head to prevent him from spitting. The first time the officers placed Nieves in the restraint chair, he was able to free himself from the arm straps. The second attempt at restraint was more successful, and once Nieves was securely in the chair he was no longer a threat to himself or to the officers.

Rodney Lambert was another pre-trial detainee; he was indicted on the same federal civil rights charges as Crochiere. He pled guilty, cooperated with the government and

testified against Crochiere. His cell was located three cells down from Nieves's cell. Lambert had a hot pot in his cell, and after Nieves was restrained and the commotion died down, Lambert began boiling water for soup. Crochiere approached Lambert's cell and asked Lambert if he had any salt. Crochiere wanted to rub salt into the open wound on Nieves's forehead. Lambert said that he did not, but offered Crochiere an alternative weapon: a cup of boiling water. Crochiere initially declined the offer, but soon returned and requested the boiling liquid. Lambert poured a cup of steaming water for Crochiere, who took the cup and walked toward Nieves's cell. Moments later, Nieves screamed out in pain, exclaiming that "[t]hey burned my pee pee," and that he was hurt. Following these screams, another voice said, "Now you know how the little girl felt."

Among the government's witnesses who testified to these events were Michael Robichaud, a correctional officer on duty on the evening of April 18, 1993; Foimai Tau, a Unit Supervisor on duty the same evening; and Scott Croteau, Anibal Antuna, and Rodney Lambert, three inmates whose cells were located in the same tier as Nieves's cell.

Nieves complained to Officer Robichaud of pain in his groin. Robichaud related this information to Lieutenant Tau, the Unit Supervisor. Lieutenant Tau went to see Nieves, who asked to see a nurse because someone had poured hot water on him. Lieutenant Tau summoned Nurse Elaine Gustafson, who spoke with Nieves but, being at the end of her shift, refused to examine him. Nurse Dorothy Hester, the supervising nurse at the jail, did examine Nieves the following morning. Because Nieves told her he had an injury in his groin area, she examined that area and observed a second-degree burn with blisters. The burn extended down to his inner thigh area, and upwards to his testicles.

On April 20, two days after the burning, Nieves was taken to Bridgewater State Hospital for a psychological examination as to his competence to stand trial for the charge of murder. A correctional officer at Bridgewater State conducted a routine strip search of Nieves and observed blisters and injury in Nieves's groin area. Pursuant to routine practice the officer photographed the injury, and the photograph was later sent, along with a report, to the Worcester County Sheriff's Office.

Kevin Foley, Assistant Deputy Superintendent of the Worcester County Sheriff's Office, then commendably initiated an investigation of the burning. Foley requested reports regarding Nieves's injury from several individuals, including Crochiere, Tau, and Gustafson. All of them denied that Nieves had been burned, or that Nieves had complained of pain and of being burned by a correctional officer. The following year, around September of 1994, the Federal Bureau of Investigations began an investigation into the events surrounding Nieves's injury, which, in turn, led to the prosecution of this case. Nurse Gustafson and Supervisor Tau eventually testified that they had previously reported falsely on the events of April 18, 1993, and stated that Nieves actually did complain of pain in his groin and told them that he had been burned with hot water.

## II.

*Jury View*

█ ▪ On the second day of trial, Crochiere filed a motion for a jury view of the lower left tier of cells at the jail, the location of these events. Crochiere argued that it was only by viewing the tier of cells that the jurors could properly assess the validity of the statements made by several of the witnesses —specifically inmates Croteau and Lambert—about what they saw and heard on that night. The district judge initially deferred the decision on the view, so that he could hear more of the evidence and "have a better sense of whether a view [would be] important and worthwhile in the context of the case." The court ultimately denied the view, reasoning that it would be "not just an unnecessary use of time, but actually potentially confusing and misleading, because neither Croteau nor Lambert said that they could see anybody going into Nieves's cell or see anything that was going on in the cell."

■ The decision to permit a view is entrusted to the sound discretion of the trial court. *See United States v. Pettiford,* 962 F.2d 74, 76 (1st Cir.1992); *United States v. Passos–Paternina,* 918 F.2d 979, 986 (1st Cir.1990). A court generally acts within that discretion in denying a motion for a view when there is sufficient evidence describing the scene in the form of testimony, diagrams, or photographs. *See Pettiford,* 962 F.2d at 76; *United States v. Drougas,* 748 F.2d 8, 31 (1st Cir.1984). In making this determination, the court may consider such factors as the orderliness of the trial, whether the jury would be confused or misled, whether it would be time-consuming or logistically difficult, and whether cross-examination had been permitted regarding the details of the scene. *See id.; Pettiford,* 962 F.2d at 76; *Passos–Paternina,* 918 F.2d at 986; *Bundy v. Dugger,* 850 F.2d 1402, 1422 (11th Cir. 1988).

Crochiere made a non-frivolous argument in support of the view as to the events in Nieves's cell which underlay the violation of civil rights charge, as opposed to the conspiracy charge. Inmates Croteau and Lambert did at times testify to having been able to see beyond what was happening in front of their own cells. For example, Lambert testified that he could see officers walking into and out of Nieves's cell, and that he could see Crochiere "in front of one of the cells to [his] right." The evidence in this case was somewhat inconsistent, and the credibility of each witness's story as to what he saw and when he saw it was critical. The average juror has not seen a jail cell block, and might well have difficulty understanding the layout and the ability (or inability) of inmates to see up and down the corridor where Nieves's cell was located. Crochiere contended that photographs and charts could not do adequate justice to the layout and spacial arrangements of the cell block. *Cf. Pettiford,* 962 F.2d at 76 (upholding denial of view where view would not have provided clearer portrayal of scene than photographs did).

It is also true, as the district judge noted, that neither Croteau nor Lambert testified that they could see into Nieves's cell. Most of the inmates' testimony was of what they heard, and what they saw happen in front of their own cells. A view would not have helped to discredit this testimony. Additionally, the defendant had ample opportunity to cross-examine the various government witnesses on their ability to perceive what they claimed to see. The question of the view was not an easy one, and the district judge's decision was considered.

■■ In light of the acquittal on the substantive civil rights charge, we need not decide the question of whether there was an abuse of discretion in denying the view. Any error Crochiere may claim in this ruling was harmless. "In the usual case, a non-constitutional evidentiary error will be treated as harmless if it is highly probable that the error did not contribute to the verdict." *See United States v. Rose,* 104 F.3d 1408, 1414 (1st Cir.1997). The government bears the burden of persuasion in a harmless error analysis. *See id.*

The view was relevant primarily to the substantive § 242 Count, of which Crochiere was acquitted, and not to the conspiracy count. The evidence was more than adequate to support the conspiracy count that Crochiere took boiling water from Lambert after saying he wanted a way to hurt Nieves. View or no view, Lambert plainly was competent to testify about what he did in his own cell and what he and Crochiere said there. Inmate Croteau also testified that he saw Crochiere walk past his cell in the direction of Lambert's cell, which was directly to the left of Croteau's cell. Croteau stated that he then heard Crochiere say to Lambert, "Can I get some of that?" and then observed Crochiere walk past Croteau's cell again, in the direction of Nieves's cell, this time carrying a cup of steaming liquid. A view would not have undercut any of this testimony, all directly relevant to the conspiracy count.

Crochiere argues that the view was relevant to the conspiracy count because it directly implicated the witnesses' credibility. Although a view might have had some indirect impact on the jury's assessment of witness credibility, Crochiere had ample opportunity to, and did, impeach the witnesses' credibility in a variety of ways at trial. The jury nevertheless chose to believe the evi-

dence supporting the conspiracy count, and a view was unlikely to have altered this outcome.

*Jury Instructions: Overt Acts*

■ Crochiere argues that the district court gave erroneous jury instructions on the elements of a conspiracy under § 241, because the court stated that the government was not required to prove the existence of an overt act in furtherance of the conspiracy. Crochiere did not submit any proposed instructions on § 241, nor did he object to the absence of an overt act instruction when specifically questioned on this issue by the district judge. In these circumstances, the standard of review is plain error. *See United States v. Alzanki,* 54 F.3d 994, 1003 (1st Cir.1995). Under this standard, the burden rests with Crochiere to establish that "the error was 'clear,' in the sense that it was 'obvious,' that it affected 'substantial rights,' and that failure to vacate [the conviction] would result in a 'miscarriage of justice.'" *Id.* (citing *United States v. Olano,* 507 U.S. 725, 731–38, 113 S.Ct. 1770, 1776–80, 123 L.Ed.2d 508 (1993)).

There was no error, plain or otherwise, in Judge Wolf's instructions to the jury. Section 241 makes it unlawful for

> two or more persons [to] conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same. . . .

18 U.S.C. § 241.

The question whether § 241 requires proof of an overt act is an issue that the Supreme Court has not specifically addressed. The Circuits have expressed conflicting views on the question. The Ninth Circuit has held that § 241 does not require proof of an overt act. *See United States v. Skillman,* 922 F.2d 1370, 1375–76 (9th Cir.1991). The Fifth Circuit has inconsistently stated both that § 241 does not require an overt act, *see United*

*States v. Morado,* 454 F.2d 167, 169 (5th Cir.1972), and that § 241 does require proof of an overt act, *see United States v. Greer,* 939 F.2d 1076, 1099 (5th Cir.1991); *United States v. McKenzie,* 768 F.2d 602, 606 (5th Cir.1985); *United States v. Kimble,* 719 F.2d 1253, 1256 (5th Cir.1983). In none of the Fifth Circuit cases, however, was the question a central issue in the case. The Sixth Circuit has stated, also in dictum, that § 241 does require proof of an overt act. *See United States v. Brown,* 49 F.3d 1162, 1165 (6th Cir.1995).

This Circuit has never decided the question. The Supreme Court case of *United States v. Shabani,* 513 U.S. 10, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994), we think, requires a holding that § 241 contains no overt act requirement. In *Shabani,* the Court found that there was no overt act requirement where the language of the drug conspiracy statute, there 21 U.S.C. § 846,[1] did not require proof of an overt act, and the common law of conspiracy at the time the statute was enacted did not require an overt act. *Accord United States v. Paiva,* 892 F.2d 148, 155 (1st Cir.1989). The Supreme Court noted that the language of the statute does not require "that an overt act be committed to further the conspiracy, and [the Court has] not inferred such a requirement from congressional silence in other conspiracy statutes." *Shabani,* 513 U.S. at 13, 115 S.Ct. at 384 (citing *Nash v. United States,* 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232 (1913), holding that no overt act is required for conspiracy liability under the Sherman Act, and *Singer v. United States,* 323 U.S. 338, 340, 65 S.Ct. 282, 283–84, 89 L.Ed. 285 (1945), holding that no overt act is required for conspiracy liability under the Selective Service Act). "*Nash* and *Singer* follow the settled principle of statutory construction that, absent contrary indications, Congress intends to adopt the common law definition of statutory terms." *Shabani,* 513 U.S. at 13, 115 S.Ct. at 384. And, the Court continued, "the common law understanding of con-

---

1. 21 U.S.C. § 846 provides:
   Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those pre-

scribed for the offense, the commission of which was the object of the attempt or conspiracy.

spiracy 'does not make the doing of any act other than the act of conspiring a condition of liability.'" *Id.* at 13–14, 115 S.Ct. at 384 (quoting *Nash*, 229 U.S. at 378, 33 S.Ct. at 782).[2]

The same analysis must apply to a construction of § 241: absent a showing of legislative intent to the contrary, we assume that Congress intended to adopt the common law understanding of conspiracy when it used the word "conspire." The legislative history of § 241 reveals no contrary intent, and at common law "it was neither necessary to aver nor prove an overt act in furtherance of the conspiracy." *Bannon v. United States*, 156 U.S. 464, 468, 15 S.Ct. 467, 469, 39 L.Ed. 494 (1895), *quoted in Shabani*, 513 U.S. at 14, 115 S.Ct. at 384.

In *Shabani*, the Court compared the language of the drug conspiracy statute, which contains no express overt act requirement, with the language of the general conspiracy statute, 18 U.S.C. § 371,[3] which does contain an express overt act requirement. The Court found this dichotomy "instructive," noting that "[i]n light of this additional element in the general conspiracy statute, Congress' silence in § 846 speaks volumes. After all, the general conspiracy statute preceded and presumably provided the framework for the more specific drug conspiracy statute." *Shabani*, 513 U.S. at 14, 115 S.Ct. at 385.

The general conspiracy statute, 18 U.S.C. § 371, with its explicit overt act requirement, also preceded the enactment of § 241. The general conspiracy statute was originally enacted by Congress in 1867, 14 Stat. 484, Add. 25, and remains essentially unchanged today. The civil rights conspiracy statute, 18 U.S.C. § 241, was enacted in 1870, "as part of what came to be known as the Enforcement Act of 1870," *United States v. Price*, 383 U.S. 787, 801, 86 S.Ct. 1152, 1161, 16 L.Ed.2d 267 (1966) (footnote omitted), and also remains in

substantially the same form today. By the time it enacted what is now § 241, Congress had, when it wanted to import an overt act requirement, made it explicit. But Congress chose not to do so in § 241. We recognize, but are not persuaded by, a contrary argument that Congress, having placed the overt act requirement in the general conspiracy statute, felt it unnecessary to place such language in future conspiracy statutes although it fully intended the overt act requirement to apply. This argument cannot be squared with the *Shabani* Court's interpretation of congressional silence.

Our conclusion that Congress did not intend to require an overt act in § 241 is bolstered by Supreme Court cases that have emphasized the breadth of §§ 241 and 242, and the prosecutorial force that Congress intended to give them. In *Price*, the Court discussed the history of §§ 241 and 242. The Court noted that the statutes

> must be viewed against the events and passions of the time. The Civil War had ended in April 1865. Relations between Negroes and whites were increasingly turbulent. Congress had taken control of the entire governmental process in former Confederate States.
>
>     . . . .
>
> Within the Congress pressures mounted in the period between the end of the war and 1870 for drastic measures. . . . On May 31, 1870, the Enforcement Act of 1870 [current § 241] was enacted.
>
> In this context, it is hardly conceivable that Congress intended § 241 to apply only to a narrow and relatively unimportant category of rights.

*Id.* at 803–05, 86 S.Ct. at 1161–63 (footnotes omitted). Although the *Price* Court's focus was on the rights that § 241 protects and not on the existence of an overt act requirement,

---

2. In response to Shabani's argument that the law does not punish criminal thoughts, the Court replied that "[t]he prohibition against criminal conspiracy, however, does not punish mere thought; the criminal agreement itself is the actus reus. . . ." *Shabani*, 513 U.S. at 16, 115 S.Ct. at 386.

3. 18 U.S.C. § 371 provides, in relevant part:

> If two or more persons conspire either to commit any offense against the United States . . . or any agency thereof in any manner or for any purpose, and one or more of such persons *do any act to effect the object of the conspiracy*, each shall [be subject to criminal penalties].
> (emphasis added)

its discussion provides strong support for the proposition that the Reconstruction Era Congress did not intend § 241 to have a narrow scope. Given this backdrop, it is difficult to imagine that Congress could have intended a definition of conspiracy in § 241 that was *narrower* than the common law definition of the term. Were we to judicially import on overt act requirement, we would be narrowing the type of activity that Congress intended to reach when it enacted § 241. This we are not authorized to do.

*Sufficiency of the Evidence*

Crochiere's final challenge to his conviction rests on the contentions that his conviction on the conspiracy count cannot stand because it is inconsistent with the acquittal on the substantive count, and that in any event the evidence on the conspiracy count was insufficient for a finding of guilty. We reject these claims.

Even if the verdicts were inconsistent, the Supreme Court and this court have clearly stated that inconsistent verdicts are no basis for setting aside a conviction.[4] *See United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (reaffirming the rule in *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), that inconsistency of verdicts is not a basis for vacating a conviction, and rejecting any exceptions to the rule); *United States v. Lopez,* 944 F.2d 33, 41 (1st Cir.1991) (noting that "the Supreme Court has made it clear that verdict inconsistency in itself is not a sufficient basis for vacating a conviction.") (citing *U.S. v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461).

In any event, the verdicts in this case are not inconsistent because the elements of the two Counts are not identical. Count One of the indictment charged that Crochiere *conspired* with Lambert to violate Nieves's civil rights, while Count Two charged Crochiere with the actual act of violation—the pouring of the scalding liquid onto Nieves's lap. A guilty verdict on Count Two would have required the jury to find that Crochiere himself poured the hot liquid

on Nieves, and that Crochiere's actions "result[ed] in bodily injury" to Nieves. The jury was not required to find either of these elements beyond a reasonable doubt to convict on the conspiracy count alone. The jury could easily have concluded that there was not enough evidence to prove beyond a reasonable doubt that Crochiere was the individual who actually poured the scalding liquid onto Nieves's lap. There was no eyewitness testimony regarding this act. On the other hand, there was eyewitness testimony on the conspiracy count. Lambert testified that he gave the cup of steaming water to Crochiere intending that the water be used to hurt Nieves. There was ample evidence from which the jury could have concluded that Crochiere was a willing participant, and harbored the same unlawful intent to punish Nieves. Crochiere had previously asked Lambert for salt to rub into Nieves's bleeding forehead. Croteau testified that he heard Crochiere say "give me some of that" to Lambert, and that moments later Crochiere walked past Croteau's cell with a cup of steaming water in the direction of Nieves's cell. Robichaud testified that he saw this exchange occur between Lambert and Crochiere.

In sum, a jury could easily have found sufficient evidence for a conviction on the conspiracy count, and insufficient evidence for a conviction on the substantive count, without these different outcomes being logically inconsistent. This analysis also disposes of Crochiere's claim that his motion for a judgment of acquittal should have been granted by the district court because the evidence was insufficient to support a finding of guilty on the conspiracy count. *See United States v. Lopez,* 944 F.2d 33, 39 (1st Cir.1991) (denial of motion for judgment of acquittal based on insufficiency of evidence claim is subject to deferential review).

*Affirmed.*

---

4. Crochiere cites a Northern District of Illinois case for the proposition that inconsistent verdicts may require setting aside a conviction where those verdicts are based on charges with "virtu-
ally identical elements." *United States v. Infelise,* 813 F.Supp. 599 (N.D.Ill.1993). That case is not controlling authority.