April 12, 1996 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

 

No. 94-1016

 UNITED STATES,
 Appellee,

 v.

 FELIPE RAMIREZ-FERRER,
 Defendant - Appellant.

 

No. 94-1017

 UNITED STATES,
 Appellee,

 v.

 JORGE L. SUAREZ-MAYA,
 Defendant - Appellant.

 

No. 94-1018

 UNITED STATES,
 Appellee,

 v.

 PAUL TROCHE-MATOS,
 Defendant - Appellant.

 

 ERRATA SHEET

 The en banc opinion of this Court issued on March 27, 1996,
is amended as follows:

 On the cover sheet, government's counsel should read:
Kathleen A. Felton, Attorney, Department of Justice, with whom 
Guillermo Gil, United States Attorney, Jos A. Quiles-Espinosa, 
Senior Litigation Counsel, and Epifanio Morales-Cruz, Assistant 
United States Attorney, were on supplemental brief for appellee.

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 94-1016

 UNITED STATES,

 Appellee,

 v.

 FELIPE RAMIREZ-FERRER,

 Defendant - Appellant.

 

No. 94-1017

 UNITED STATES,

 Appellee,

 v.

 JORGE L. SUAREZ-MAYA,

 Defendant - Appellant.

 

No. 94-1018

 UNITED STATES,

 Appellee,

 v.

 PAUL TROCHE-MATOS,

 Defendant - Appellant.

 

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Juan M. P rez-Gim nez, U.S. District Judge] 

 

 Before

 Torruella, Chief Judge, 

 Campbell, Senior Circuit Judge, 

 Selya, Cyr, Boudin, Stahl and Lynch,

 Circuit Judges. 

 

 Roxana Matienzo-Carri n, by Appointment of the Court, for 
appellant Felipe Ram rez-Ferrer.
 Ram n Garc a-Garc a for appellant Jorge L. Su rez-Maya. 
 Francisco Serrano-Walker for appellant Ra l Troche-Matos. 
 Kathleen A. Felton, Attorney, Department of Justice, with 
whom Guillermo Gil, United States Attorney, and Jos A. Quiles- 
Espinosa, Senior Litigation Counsel, and Epifanio Morales-Cruz 
were on supplemental brief for appellee.

 

 March 27, 1996
 

 OPINION EN BANC
 

 -2-

 TORRUELLA, Chief Judge. Defendants-appellants TORRUELLA, Chief Judge 

(collectively, "defendants") Felipe Ram rez-Ferrer ("Ram rez-

Ferrer"), Jorge L. Su rez-Maya ("Su rez-Maya") and Ra l Troche-

Matos ("Troche-Matos") appeal to this court their convictions on

drug and firearm charges. A panel of this court: 1) affirmed the

convictions of all defendants for possession of cocaine with

intent to distribute; 2) affirmed the convictions of Su rez-Maya

and Ram rez-Ferrer for using a firearm in relation to a drug

trafficking offense, but reversed the conviction of Troche-Matos

on a similar charge; and 3) reversed the convictions of all

defendants for importation of narcotics into the United States.

Thereafter, the full court reheard the case en banc. The en banc 

court now reverses the convictions of all defendants for

importation of narcotics into the United States and remands the

firearm convictions for further consideration in light of an

intervening Supreme Court decision.

 I. BACKGROUND I. BACKGROUND

 The evidence, taken in the light most favorable to the

government, United States v. Abreu, 952 F.2d 1458, 1460 (1st 

Cir.), cert. denied, 503 U.S. 994 (1992), permitted the jury to 

find the facts that follow. We emphasize the facts pertinent to

the importation charge. On March 13, 1993, the Police of Puerto

Rico ("POPR") received an anonymous telephone call. The caller

informed the POPR that defendant Su rez-Maya and three other

individuals had left for Mona Island, Puerto Rico, in a boat

belonging to a relation of Su rez-Maya, and that the four men

 -3-

were going to acquire a load of cocaine and ferry it to the main

island of Puerto Rico. Mona Island is one of numerous small

islands near Puerto Rico's main island, and is part of the

Municipality of Cabo Rojo, which also includes part of the main

island's southwest corner.1 Mona Island is physically separated

by about 39 miles of water from the main island of Puerto Rico.

 Prior to 1989, the boundaries of the United States

extended three miles offshore. United States v. Williams, 617 

F.2d 1063, 1073 n.6 (5th Cir. 1980). In that year, they were

extended by Presidential Proclamation with qualifications to 12

miles. Proclamation No. 5928, 54 Fed. Reg. 777 (1989) (citing

the 1982 United Nations Convention on the Law of the Sea, to

which the U.S. is a signatory, but which the U.S. had not

ratified as of February, 1996). Thus, given the 12-mile limit,

to travel from Mona Island to the main island of Puerto Rico

requires that a vessel cross international waters.

 After verifying that the boat in question was indeed

away from its mooring, the United States Customs Service (USCS)

and POPR flew to Mona Island on a USCS helicopter. The

  

1 The only evidence in the record is that defendants picked up 
the cocaine at Mona Island. Mona Island is not just
geographically part of the Puerto Rico Archipelago, which
includes the Islands of Puerto Rico, Culebra, Vieques, Desecheo,
Caja de Muertos, Mona and Monito, as well as various other minor
islets and keys. Mona Island is also politically part of the
Senatorial District of Mayaguez and of the Municipality of Cabo
Rojo within that district. P.R. Const. art. VIII, 1, IV.
Thus, in effect, the defendants transported the drugs in question
between two points within the same municipality within Puerto
Rico, the equivalent of within two places within Suffolk County
in Massachusetts.

 -4-

authorities located the subject boat and Su rez-Maya, accompanied

by three other men as described. At approximately 12:30 p.m. the

next day, the authorities learned that the boat was leaving Mona

Island. The boat was interdicted about one mile off the

southwest coast of Puerto Rico.

 After the boat was seized, it was found to be carrying

about 16 kilograms of cocaine. A subsequent inventory search of

the boat turned up a firearm. The seized firearm, a loaded

revolver, was found covered by a T-shirt, behind a storage

compartment near the location where Ram rez-Ferrer had been

seated at the time of the interdiction. The search also revealed

evidence linking the vessel to a relative of Su rez-Maya.

 On March 31, 1993, a grand jury indicted defendants,

charging all three in each of three separate counts. The

indictment charged each with possessing approximately 16

kilograms of cocaine with intent to distribute (count 1), 21

U.S.C. 841(a) (1) (1994); with importing such cocaine into the

United States (count 2), id. 952(a) (1994); and with possessing 

and carrying a firearm in relation to a drug trafficking crime

(count 3), 18 U.S.C. 924(c)(1) (1994). A superseding

indictment corrected the description of the seized firearm in

count 3.

 On September 28, 1993, a jury convicted all three

defendants on each count. On counts 1 and 2, relating to

possession and importation of cocaine, Su rez-Maya was sentenced

to life imprisonment, Ram rez-Ferrer to a term of 240 months, and

 -5-

Troche-Matos to a term of 120 months. The sentences of Su rez-

Maya and Ram rez-Ferrer were enhanced under 21 U.S.C. 841(b)

and 960(b) on account of prior drug crimes. On count 3, the gun

count, each appellant was sentenced to a mandatory minimum term

of 60 months to be served consecutively, as required by the

statute.

 In a decision released April 27, 1995, a panel of this

court reversed all three defendants' importation convictions,

reversed Troche-Matos' firearm conviction, and affirmed the

remaining convictions. On June 26, 1995, this court agreed to

rehear the case en banc on the issue of the importation statute's 

interpretation. Additionally, the court asked the parties to

address again the firearms convictions of Ram rez-Ferrer and

Su rez-Maya. The en banc court heard oral argument on 

September 13, 1995. While the case was pending before the en 

banc court, the Supreme Court on December 6, 1995 issued its 

opinion in Bailey v. United States, U.S. , 116 S. Ct. 501 

(1995), overturning precedent in this and other circuits as to

the proper construction of the term "use" in section 924(c)(1).

 II. THE POSSESSION CHARGE AND THE FIREARM CHARGE II. THE POSSESSION CHARGE AND THE FIREARM CHARGE

 On the possession charge under count 1, the panel

concluded that the evidence was sufficient to show that the

defendants knowingly possessed the drugs or aided and abetted

their possession. Among other evidence, the testimony permitted

the jury to conclude that the drugs were stored in a bag with a

broken zipper and that the drugs were plainly visible from

 -6-

outside the bag, easily seen by anyone on the 20-foot boat. The

en banc court did not request further argument on this issue. 

 On the firearm charge, the story is more complicated.

Section 924(c)(1) is directed against anyone who "uses or carries

a firearm during and in relation to a drug trafficking crime" and

the district court charged the jury with the language of the

statute, defining "use" in accordance with circuit precedent.2

Assuming that each appellant was aware of the revolver, its

presence on the vessel made it available for use to protect the

drugs. The panel ruled that, assuming knowledge of the firearm,

its proximity and potential for use permitted the jury to convict

under the so-called "fortress" theory previously adopted by this

court and others. See, e.g., United States v. Wilkinson, 926 

F.2d 22, 25-26 (1st Cir.), cert. denied, 111 S. Ct. at 2813 

(1991).

 The panel had more difficulty with the question of

whether a reasonable jury could find that each of the defendants

knew that the gun was present; unlike the drugs, the gun was not

in plain view. The panel upheld the conviction of Ram rez-

Ferrer, since the revolver was located behind a compartment

adjacent to his seat and served an obvious purpose to protect the

cocaine. The panel also upheld the conviction of Su rez-Maya,

who was the central figure in the drug venture and the captain of

  

2 The indictment mistakenly charged the defendants with "having
possess[ed] and carr[ied] the firearm." There is no claim that
the variance was prejudicial error.

 -7-

the boat. As to Troche-Matos, the court ruled that a reasonable

jury could not infer that he knew of the weapon.

 In their petitions for rehearing on this issue, Su rez-

Maya and Ram rez-Ferrer drew our attention to United States v. 

Torres-Maldonado, 14 F.3d 95 (1st Cir. 1994), arguing that on 

somewhat similar facts a panel of this court had found the

evidence insufficient to support convictions under section

924(c)(1). In that case, the weapon was found in a zippered

opaque tote bag on a sofa in a room in which drugs and money were

also found, and the court concluded the evidence was not adequate

to establish that two of the individuals in the room actually or

constructively possessed the weapon. Id. at 102. Despite its 

differing outcome, Torres-Maldonado does not conflict with the 

original Ram rez-Ferrer panel on the proper legal standards to be 

applied.

 Although the en banc court agreed to rehear the case as 

a whole, sufficiency of the evidence is not normally a question

for en banc consideration unless a mistaken legal standard has 

been used. Any possible tension between the panel opinion and

the decision in Torres-Maldonado stems from their appraisals of 

their own respective facts. But given the kaleidoscope of

different facts presented in drug and gun cases and the varying

compositions of panels in the court, the en banc court was, and 

remains, of the view that differences in weighing evidence are

inevitable in cases of this kind even within a single circuit.

Nothing will produce perfect harmony among outcomes unless the

 -8-

court chooses to hear every drug and gun case en banc, a course 

that is neither practical nor useful. Therefore, we conclude

that the full court should not seek to decide en banc whether the 

evidence against each appellant in this case was or was not

sufficient on the gun charge. As a result, the en banc court 

declines to review the adequacy of the evidence on either count 1

or count 3.

 This does not end the matter. While the en banc 

opinion was being prepared, the Supreme Court decided Bailey. 

There, the Supreme Court determined that a conviction for firearm

"use" under section 924(c)(1) required "evidence sufficient to

show an active employment of the firearm by the defendant, a use 

that makes the firearm an operative factor in relation to the

predicate offense." Bailey, U.S. at , 116 S. Ct. at 505. 

As far as "use" is concerned, the Supreme Court rejected the

fortress theory, disagreeing with the suggestion that "a gun

placed in the closet is 'used' because its mere presence

emboldens or protects its owner." Id., U.S. at , 116 S. 

Ct. at 508.

 Although the Supreme Court has rejected the fortress

theory of "use" under which defendants were convicted, the issue

of their firearm convictions remains unresolved. Section

924(c)(1) imposes a prison term upon a person who "during and in

relation to any . . . drug trafficking crime . . . uses or

carries a firearm." 18 U.S.C. 924(c)(1) (emphasis added). 

Defendants were convicted on a gun count that went to the jury

 -9-

with instructions that permitted the jury to convict if it found

that defendants either used or carried the weapon found under the

T-shirt behind Ram rez-Ferrer. The interpretive problems posed

by the term "carry" are apparent, given the shadow that Bailey 

casts over previous circuit precedent. Moreover, Bailey contains 

little comment on the proper scope of "carry" in section

924(c)(1). By contrast, the Supreme Court went on to state that

"use" cannot extend to hypothetical situations where the offender

has "hid[den the firearm] where he can grab it and use it if

necessary," id., U.S. at , 116 S. Ct. at 508, a 

description that, in the best light for the government, includes

the set of facts before this en banc panel. However, the Court 

went on to state that the carry prong could cover situations that

the use prong could not, noting that a firearm can be carried

without being used, "e.g., when an offender keeps a gun hidden in 

his clothing throughout a drug transaction." Id., U.S. at 

 , 116 S. Ct. at 507. As a result, defendants' conviction for

"use" should be vacated, and they should face only

reconsideration of their convictions under the carry prong, since

Bailey has both limited the word "use" to the extent that it 

cannot apply in the instant case and emphasized that "carry" has

meanings not covered by "use." Id., U.S. at , 116 S. Ct. 

at 508-09 (cautioning against readings of the word "use" that

render the term "carry" superfluous, and remanding two unrelated

defendants' convictions for consideration under the carry prong).

 -10-

 In light of Bailey, then, we decline to decide en banc 

defendants' firearm convictions, and instead require further

consideration of count 3 under section 924(c)(1). We think that

these problems should be addressed in proceedings before the

panel rather than the en banc court.  

 -11-

 III. THE IMPORTATION COUNTS III. THE IMPORTATION COUNTS

 In accord with the panel's decision, the en banc court 

has concluded that the importation statute, 21 U.S.C. 952, does

not embrace defendants' conduct in transporting 16 kilograms of

cocaine from Mona Island, Puerto Rico, to approximately one mile

offshore of the main island of Puerto Rico, notwithstanding the

fact that the contraband traversed international waters during

the journey. The court concludes that this interpretation

accords with both the wording of the statute and general

principles of statutory construction. Furthermore, absent either

pertinent legislative history or precedent, the en banc court 

likewise concludes that the historical application and the

potential future application of the statute by the government

weigh in favor of this interpretation.

 A. Statutory Language A. Statutory Language

 The defendants were convicted under 21 U.S.C. 952(a)

for importing drugs into the United States. In relevant part,

 952(a) provides that

 it shall be unlawful . . . to import into
 the United States from any place outside
 thereof, any controlled substance.

The defendants contend that they did not violate this statute

because they did not bring the drugs at issue into the United

States from a "place outside thereof." To the contrary, they

argue that the evidence in the record only establishes that they

brought the drugs from one location within the jurisdiction of

the United States (i.e., Mona Island) to another (i.e., the 

 -12-

waters off Puerto Rico's main island). The government, on the

other hand, claims that, because the drugs passed through

international waters on their way from Mona Island, the drugs

were brought into the United States from a "place outside

thereof" (i.e., international waters). Essentially, the 

government argues that the quoted language of section 952(a)

establishes a kind of transparent curtain around the

jurisdictional boundaries of the United States, and proscribes

any deliberate shipment of drugs through that curtain without

regard to the "place" from which the shipment actually

originated.

 In Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), 

the Supreme Court stated: "We need not leave our common sense at

the doorstep when we interpret a statute." Id. at 241. The 

government's newly minted interpretation of section 952(a) not

only is contrary to the plain language of the statute, and flies

in the face of every common and logical meaning of the word

"importation," but also places at risk of prosecution thousands,

perhaps hundreds of thousands, of persons who up to now have not

been prosecuted under this novel construction of section 952(a).

 We should, first of all, leave no doubt as to what this

case is not about. We are not faced with a factual situation in 

which a defendant leaves United States domestic territory empty-

handed, proceeds to international waters or to a foreign

territory to acquire contraband there, and then returns to

domestic territory with this contraband (for example, when a

 -13-

vessel leaves the United States, sails out to sea where it

obtains drugs from a "mother ship" anchored in international

waters, and then returns to the United States). In that

hypothetical situation, the government might have a somewhat more

convincing argument that international waters can be deemed the

"place" from which the controlled substance is being imported

into the United States.3 While we might imagine strong

arguments on both sides, we are presently faced with a much

narrower factual situation. We need only decide whether Congress

intended to treat in-transit international waters as a "place" 

for purposes of the importation statute when the government's

evidence shows that both the origination and the destination of

thecontrolled substance occurred within United States territory.4
  

3 We agree with the dissent that both the day hiker who strays
into Canadian territory and then crosses back into the U.S., and
the tourist returning from British territory, see dissent at 44, 
would violate section 952 if they carry contraband drugs, because
they obviously would be entering U.S. territory from a "place
outside thereof."

4 The government treats defendants' trip across the
international waters between Mona Island and Puerto Rico's main
island as being the same as if defendants had carried drugs from
Mona Island into another sovereign nation and then back into
Puerto Rico. Doubtless the latter would constitute an
importation. International waters, however, are not anything
like a sovereign nation. Waters twelve miles beyond Mona Island
and the main island of Puerto Rico are "international" in the
sense that the vessels of other nations have a right of free
navigation through them. See 54 Fed. Reg. 777 (1988) 
(Proclamation 5928, entitled "Territorial Sea of the United
States of America") (citing the 1982 United Nations Convention on
the Law of the Sea (to which the U.S. is a signatory, but which
the U.S. had not ratified as of January 1996)). For 200 miles,
however, they are subject to exclusive United States fishing and
mineral rights. See 1982 United Nations Convention on the Law of 
the Sea, Articles 5, 57, 76(1); Burke, The New International Law 
of Fisheries 1 (1994) (describing this regime as customary 

 -14-

 "The starting point in statutory interpretation is 'the

language [of the statute] itself.'" United States v. James, 478 

U.S. 597, 604 (1986). In its argument, the government overlooks

the fact that the text of section 952(a) includes a separate

clause not directly at issue in this case. With this separate

clause included, section 952(a), entitled "importation of

controlled substances," provides

 [i]t shall be unlawful [1] to import into
 the customs territory of the United
 States from any place outside thereof
 (but within the United States), or [2] to
 import into the United States from any
 place outside thereof, any controlled
 substance.

21 U.S.C. 952(a). The court concludes that, given a proper

interpretation of 21 U.S.C. 952(a), transport from one part of

the United States to another does not rise to the level of

importation simply by involving travel through international

waters.

 The definition of "import" ("any bringing in")

appearing in section 951 does not implicate the origin of a

shipment of drugs. Thus, the government argues that the statute

  

international law). See also 43 U.S.C. 1332 (Congressional 
declaration of policy regarding the outer Continental Shelf).
After a United States vessel has gone beyond the twelve-mile-
limit into "international" waters, it is not expected to clear
United States customs when it reenters United States territory,
as would be required had the vessel entered a foreign country
during the voyage. Coastal and fishing vessels and private
yachts commonly navigate interchangeably in international and
domestic waters when making local trips, paying little attention
to where the one ends and the other begins, and with no thought
that they are making some kind of reentry into the United States
upon their return to domestic waters.

 -15-

does not require any inquiry into the origin of a shipment of

drugs; by the government's reading, any shipment into the United

States that must pass into international waters or airspace would

be punishable under clause 2 of section 952(a). However, section

952(a) itself requires that the importation into the United

States be "from any place outside thereof" (emphasis added). It 

is the word "place" in section 952(a), when read together with

"from . . . outside," that needs to be considered in the present

circumstances, not just the word "import." The government's

interpretation rests on the assumption that Congress intended to

focus only on a result (i.e., each introduction of the drugs into 

the United States), irrespective of whether its place of origin

was another part of the United States. But if this were the

case, Congress would not have proscribed importation "from any 

place outside thereof," but merely importation "into the United 

States," omitting any mention of a place of origin. Furthermore,

we should also consider the following test of the "plain meaning"

of the word "place" in section 952(a). Anyone aware of the facts

in the record of this case, if asked, "From what 'place' was the 

illegal substance brought?" would answer "From Mona Island," not

as is argued, "From international waters."

 In addition to its failure to comport with the normal

understanding of the word "place," the government's

interpretation of clause 2 cannot be reconciled with any

reasonable reading of clause 1. Clauses 1 and 2 were enacted

simultaneously in 1970. If the phrase in clause 2 -- "place

 -16-

outside thereof" refers to the location of the drugs immediately

before they pass through the "transparent curtain" into U.S.

territory, it must be given the same connotation in clause 1

absent an indication that Congress intended otherwise. See 

Atlantic Cleaners v. United States, 286 U.S. 427, 433 (1932) 

(noting presumption that a word or phrase used more than once in

statute has same meaning); Fortin v. Marshall, 608 F.2d 525, 528 

(1st Cir. 1979) (same). The government argues that clause 2 is

merely the successor to 21 U.S.C. 174 (enacted in 1909 and

repealed in 1970), whereas clause 1 introduces a new concept

added to the statute in 1970 out of "an abundance of caution"

lest some unidentified types of transportation from U.S.

territories into U.S. customs territory might prove

nonprosecutable. Although the government states that clause 2

is the direct successor to repealed 21 U.S.C. 174, it points to

no pre-1970 case law that would corroborate the thesis that 174

(which imposed penalties against anyone who "fraudulently or

knowingly imports or brings any narcotic drug into the United

States or any territory under its control or jurisdiction") had

ever been construed so narrowly as to foreclose prosecution of

importation from a U.S. territory not part of the U.S. customs

territory (e.g., the United States Virgin Islands, Guam) to part 

of the U.S. which is part of the U.S. customs territory (i.e., 

Puerto Rico, the 50 states, and the District of Columbia). We

must bear in mind the principle that Courts must presume that

Congress knows of prior judicial or executive branch

 -17-

interpretations of a statute when it reenacts or amends a

statute. See Lorillard v. Pons, 434 U.S. 575, 580 (1978); Sierra 

Club v. Secretary of the Army, 820 F.2d 513, 522 (1st Cir. 1987). 

If we presume per Lorillard that Congress knew that pre-1970 

decisional law portended no risk of less-than-intended

enforcement, we cannot accept the government's thesis that clause

1 was passed out of an "abundance of caution."5

 "A statute ought, upon the whole, to be so construed

that, if it can be prevented, no clause, sentence, or word shall

be superfluous, void or insignificant."6 United States v. 

Campos-Serrano, 404 U.S. 293, 301 n.14 (1971); see United States 
  

5 Moreover, even if we did accept it, we think this thesis
actually cuts against the government's reading of the statute.
In other words, if Congress had doubts that the existing statute
did not proscribe shipment of drugs from a non-customs territory
into customs territory, it must have had, a fortiori, even 
greater uncertainty that the statute proscribed shipments from
customs territory to customs territory (the conduct at issue in
this case). But it is clear, that by enacting clause 1, Congress
did not proscribe such activity.

6 Although we are charged by our dissenting colleagues with the
commission of major mayhem to the canons of statutory
construction, this claim may very well be a case of whose ox is
gored. See Karl N. Llewellyn, Remarks on the Theory of Appellate 
Decision and the Rules or Canons About How Statutes Are to Be 
Construed, 3 Vand. L. Rev. 395 (1950). It is interesting to 
note, that by suggesting that the cocaine in question did not
originate in Mona Island, see dissent at 35, the dissent itself 
violates a fundamental rule of appellate review, one which is
anchored in elementary principles of due process, to the effect
that appellate courts are not to go outside the record. In this
case, the suggestion that "Mona Island is a transshipment point"
is not only not part of the record but is in fact immaterial to
the charge. Puerto Rico or Florida or California are
transshipment points of imported drugs to other internal areas of 
the United States. Yet such internal transshipment of contraband 
that may have originated outside the United States does not
itself constitute a violation of 21 U.S.C. 952, which only
covers importation from a "place outside thereof."

 -18-

v. Holmquist, 36 F.3d 154, 160 (1st Cir. 1994) (same). The key 

to the "whole act" approach is that all provisions and other

features of the enactment must be given force, and provisions

must be interpreted so as not to derogate from the force of other

provisions and features of the whole statute. See generally 

Norman J. Singer, Sutherland Statutory Construction 47.02, at 

120 (5th ed. 1992). A close analysis of section 952(a) reveals

that the government's broad interpretation of clause 2 would both

render clause 1 superfluous and make it technically impossible to

violate. Furthermore, the analysis makes it clear that Congress

considered the conduct at issue in this case and rejected

proscribing it under the statute.

 First, clause 1 proscribes the importation of illegal

drugs into the customs territory of the United States from a

place outside the customs territory of the United States, but

within the United States. The "customs territory of the United

States" is defined as "the States, the District of Columbia, and

Puerto Rico." See Harmonized Tariff Schedule of the United 

States, n.2. Thus, clause 1 proscribes importation from any

other U.S. territory not within the customs territory (e.g., U.S. 

Virgin Islands, Guam) into "the States, the District of Columbia,

and Puerto Rico."

 That Congress specifically addressed this situation

suggests that it believed that the language of clause 2 did not

necessarily cover such conduct. The government's broad reading

of clause 2, however, brings any conduct conceivably addressed

 -19-

under clause 1 within the coverage of clause 2. In other words,

any contraband shipped from a place inside the United States (but

not within the customs territory -- e.g., the U.S. Virgin 

Islands) would first pass through international waters before it

entered into the customs territory of the United States. Thus,

the conduct aimed at under clause 1 would be proscribed by the

government's interpretation of clause 2. Hence, the government's

reading of clause 2 renders clause 1 completely superfluous.

 Second, the government's broad reading of clause 2

would make it arguably impossible to prosecute anyone under

clause 1. Under the government's reading, the phrase "any place

outside thereof" essentially means the point at which the drugs

were located immediately before passing into the United States

(i.e., the international space just outside the jurisdictional 

limit of the United States). If one applies this reading to the

same phrase in clause 1, it is impossible to violate clause 1.

In other words, there is no "place" just outside of the

jurisdictional limits of the customs territory of the United

States, that is also within the United States. Any place that is

just outside the customs territory of the United States is

international waters. Thus, arguably no individual could ever

violate clause 1 because no one could ship from a place within

the United States (but outside the customs territory) directly

into the customs territory of the United States: the individual

would always be directly shipping from international waters. If

a prosecutor attempted to charge a defendant under clause 1 for

 -20-

shipping drugs from the U.S. Virgin Islands to Florida (conduct

clearly meant to be proscribed by clause 1), the defendant could

argue that he or she did not violate the clause because the

"place" from which the drugs were imported was not the U.S.

Virgin Islands but the international space just outside of

Florida. Although the prosecutor could argue that the "place"

referred to by the statute included both the international space

and the U.S. Virgin Islands, such a reading would be hard to

square with the gloss the government puts on the phrase under

clause 2.7

 Third, and perhaps most convincing, a close analysis of

clause 1 reveals that Congress contemplated whether or not

illegal drugs shipped from one part of the United States through

international waters and back into the United States should be

prohibited under 21 U.S.C. 952. Specifically, clause 1 evinces

Congress' intent to proscribe such conduct in the certain

instances in which drugs are imported into the customs territory

  

7 One could quibble here because national territorial waters
extend farther than state territorial waters off any one state's
coast. Thus, it is possible to argue that an individual could
violate clause 1 by importing from the national waters (arguably,
outside the customs territory, but inside the United States) into
the state waters. However, the point fails to undercut our
analysis in any significant way. In other words, even if
"states" in the definition of customs territory extends only to
the state jurisdictional waters (a point which we do not
necessarily concede), it seems unlikely that in enacting clause
1, Congress was aiming only at drugs shipped from one state out
into national waters and back into that or another state (as
everything else that would violate clause 1 would fall within the
government's broad interpretation of clause 2). Moreover, such a
reading would be inconsistent with the general usage of the term
"customs territory" in the Harmonized Tariff Schedule.

 -21-

of the United States from a point in the United States but

outside the customs territory. Clearly, Congress could have gone

further and proscribed any shipment of drugs originating inside

the United States that passed through international waters and

entered back into the United States, but it did not. By

explicitly limiting the statute to the conduct proscribed by

clause 1, it is fair to infer that Congress did not intend to

proscribe the additional conduct at issue in this case. The

reason for this is clear. In enacting 952, Congress was

attacking classic cases of importation, meaning international

importation, not domestic transportation, of drugs.8

 Thus, unlike the government's reading, the

interpretation adopted by the en banc court both accords with the 

plain language of the statute and gives meaning to section 952 as

a whole act. However, even if such were not the case, the

confusion that is patent even from the government's discussion of

the statute brings into play the rule of lenity, and requires us

to give defendants the benefit of the doubt on this issue.

Ratzlaf v. United States, 114 S. Ct. 655, 663 (1994); McBoyle v. 

United States, 283 U.S. 25, 27 (1931) (Holmes, J.); United States 

v. Maravilla, 907 F.2d 216, 223 (1st Cir. 1990) (Breyer, C.J.). 

 B. Congressional Intent B. Congressional Intent

  

8 Cf. Llewellyn, 3 Vand. L. Rev. at 401 (concluding that courts 
should adopt statutory interpretations that accord with "[t]he
good sense of the situation" and that represent "a simple 
construction of the available language to achieve that sense, by 
a tenable means, out of the statutory language" (emphasis in 
original)).

 -22-

 On the specific point at issue, there is no legislative

history. Nonetheless, the dissent claims that Congress did not

"care one whit whether the drugs were brought from international

waters [or international airspace9] or from a foreign land, so

long as they crossed the U.S. boundary." See dissent at 43. But 

Congress might well be concerned whether the drugs were being

brought from one place within the United States to another. The 

obvious fact that Congress may be generally presumed to oppose

the drug trade neither renders the language in question ambiguous

nor justifies its strained interpretation. Congress can be

similarly presumed to oppose murder, arson and robbery, but we do

not rely on such facts as justifying strained readings of

statutes in those areas. We can find no legitimate reason to

follow a different course here.

 C. The "Precedents" C. The "Precedents"

 As discussed, the interpretation urged by the

government leads to unreasonable results. Turning to precedent,
  

9 We agree with the dissent's concessions to the effect that
"[i]t is far from clear whether a scheduled non-stop airline
flight between two U.S. points could ever be treated as
importation under the main clause [of section 952]," and that "a
defendant would certainly argue that for all practical purposes,
drugs on such a flight are never outside the country." See 
dissent at 39. This contention purportedly refutes our
superfluousness argument, yet leaves unexplained the
disappearance of the "transparent curtain" which Congress
envisioned "around the boundaries of the United States," the
penetration of which, bearing drugs, "is the crime [of
importation]." We fail to see how a principled distinction can
be made between such an incursion into international airspace,
and the present case involving travel between "two U.S. points."
The dissent's "yes if by water, no if by air" formula for
installing its transparent curtain appears to respond to no
statutory purpose identified by the dissent.

 -23-

we see that the case law does not support the outcome proposed by

the government. The government views precedent as carrying

special weight in formulating its interpretation of 952(a).

This is obviously a principle which we generally agree with, as

far as it goes. However, the "precedent" on which the government

relies, with one exception, is inapposite.

 The language cited from United States v. Peabody, 626 

F.2d 1300, 1301 (5th Cir. 1980) ("Had the cargo of contraband

originated in Texas, that would not alter the fact that it was

meant to reenter the United States from international waters.

That is enough."), which is both the seminal authority for the

cases that follow and the anchor upon which the government relies

for its interpretation of 952(a), is particularly flawed.

Although the cryptic statement in Peabody fits the government's 

glove, a reading of that case clearly demonstrates that the

proposition for which it stands is total dicta, and is not based

on even a superficial analysis of the issues raised in the

present appeal. Indeed that opinion does not even cite 952(a),

although it may perhaps be surmised that such is the statute at

issue. Nevertheless, nothing in the factual background of that

case supports the proposition relied upon by the government.

Without question the contraband in Peabody was not coming from 

another domestic area in the United States, Texas or otherwise,

and thus the court's hyperbole was pure dicta. Peabody and its 

progeny constitute flimsy precedent upon which to hang one's hat.

 -24-

 In United States v. Phillips, 667 F.2d 971, 1033 (5th 

Cir. 1981) (holding that the importation "element may be

established by evidence that a boat from which marihuana was

unloaded went outside United States territorial waters or met

with any other vessels that had -- for example, a "mother ship"),

the facts involved contraband brought directly from Colombia

through motherships off Florida. Id. at 987. As in Peabody, the 

present issue was not decided and the quoted language is again

dicta. In United States v. Lueck, 678 F.2d 895, 904-05 (11th 

Cir. 1982), the Eleventh Circuit, relying on the specific

language quoted from Peabody, rejected the contention that proof 

of importing controlled substances from a specific point on

foreign soil is required as an element of 952(a). Id. at 905. 

However, Lueck's holding must be read and understood in light of 

the fact that the airplane in question had been spotted first

flying over the Bahamas. The record evidence in Lueck supported 

the finding of importation upon the airplane's entry into

domestic airspace. Id. at 897. In stark contrast to Lueck, we 

do not have here any evidence supporting such a finding, rather,

all we have is evidence that the illegal substance was brought

from a place within the United States. United States v. Goggin, 

853 F.2d 843, 845 (11th Cir. 1988), another case from the

Eleventh Circuit, which relies on Lueck, also concerns a flight 

from the Bahamas, id. at 844, 847, and is therefore different 

from the present appeal.

 -25-

 In United States v. Doyal, 437 F.2d 271 (5th Cir. 1971) 

(involving the predecessor statute to 952), the defendant

contended that although he was caught entering the U.S. from

Mexico with illegal drugs, he had in fact acquired the drugs in

the U.S., taken them into Mexico, and brought them back;

therefore, argued the defendant, he was not guilty of

importation. Id. at 274-75. Although the drugs in question had 

originated in the United States, the fact is that they were

brought into Mexico, and it was from there that they entered the 

domestic territory of the United States. Id. at 272. Such an 

entry from a foreign country (i.e., a "place outside" the United 

States) is not what we have before us. United States v. 

Friedman, 501 F.2d 1352 (9th Cir. 1974), also cited by the 

government, involved another entry from a place outside the 

United States -- Mexico as in Doyal. 

 Reliance on the language used by our Circuit in United 

States v. Nueva, 979 F.2d 880, 884 (1st Cir. 1992), is equally 

unhelpful in the present situation. In Nueva, law enforcement 

authorities spotted a suspect aircraft traveling from South

America to Puerto Rico; the authorities tracked the plane to a

point above the ocean off the coast of Puerto Rico, where it

dropped bales of illegal drugs at a rendezvous point for a boat.

Id. at 881-83. Picking up contraband by going into international 

waters, id., stands on the same footing as going into a foreign 

country to do so (i.e., Friedman, Doyal, Goggin, Lueck, Phillips, 

Peabody). We do not question that such a place from which the 

 -26-

defendant gains possession of the contraband, is "outside [the

United States]," and thus, that the entry from such a place, into 

the United States, meets that element of the importation charge

in 952(a).

 We thus come to United States v. P rez, 776 F.2d 797 

(9th Cir. 1985). This is the only case which factually

approximates the present one.10 There, an illegal load of

marihuana was transported by boat from the Mariana Islands (a

United States Trust Territory in the Pacific), through

international waters to Guam, another U.S. domestic area. The

court squarely holds that the transit through international

waters is sufficient to sustain an importation charge under

 952(a). It would perhaps have been helpful for present

purposes, had the deciding court discussed the issue with some

original analysis or some enlightening reasoning in support of

its ephemeral conclusion, but such was not to be. The court

merely "rounded up the usual suspects," by citing its Friedman 

case (importation from Mexico), and Peabody and its progeny 

(Lueck and Phillips), as being "instructive," id. at 801, without 

providing much more to support the resolution of an issue which

it had admittedly "never [before] addressed." Id.11 
  

10 A difference is that in the present case the two places are
within the same jurisdiction, in fact the same municipality. See 
footnote 1.

11 This is despite precedent such as United States v. Carri n, 
457 F.2d 200 (9th Cir. 1972), in which the Ninth Circuit ruled
that evidence that an aircraft landed in Los Angeles with 404
pounds of marihuana, that it had used enough fuel and had enough
time to go to Mexico, that the marihuana was in boxes marked in

 -27-

 Thus, the "precedent" cited amounts to bald assertions

without analysis.

 D. Historical Application of the Statute D. Historical Application of the Statute

 Actions speak louder than words. In this case this old

adage is not simply poetic expression, for the interpretation of

21 U.S.C. 952(a) promoted by the government is most certainly

at odds with the government's past enforcement practices under

this statute throughout its long life.

 It is difficult to accept that Congress intended the

government's reading of 952(a), considering that this reading

of the statute has somehow lain lifeless for 25 years until given

breath in this case by the prosecution. The government would

have us believe that throughout the life of this statute, which

has been on the books in practically the same form since 1970, in

every direct flight, commercial or private, between, say, the

Mainland and Puerto Rico, or the Mainland and Hawaii or Alaska,

or vice versa, or even between Miami and New York, or Nantucket,

Massachusetts and Boston, etc., all of whom at some point (or, in

fact, throughout most of their passage) fly within international

airspace before returning to domestic territory, the occupants

have always been subject to being charged under this hitherto

overlooked definition of "importation." The government's novelty

seems all the more striking in this Circuit, where

notwithstanding the hundreds (perhaps thousands) of such daily 
  

Spanish, and that one of the passengers had a map of Mexico, as
well as a match box from a Mexico motel, was not sufficient to 
establish that the marihuana had been imported from Mexico!

 -28-

flights, the government has somehow throughout these many years

never pressed such a theory of importation. Is this attributable

to prosecutorial benevolence or incompetence? Certainly not.

What we have is the tacit recognition that such acts could not

reasonably be considered "importation" within 952(a).

"Whatever other statutes defendants may have violated, they did

not violate this one." Maravilla, 907 F.2d at 223 (Breyer, C.J.) 

(holding that custom agents who murdered a Dominican citizen who

was temporarily in the United States did not violate civil rights

statute because the victim was not an "inhabitant").

 We have a similar situation with water-borne traffic.

There are literally thousands of vessels of all sizes and with

all kinds of purposes that daily pass through international

waters as they move between domestic areas which, without picking

up contraband in international waters or visiting foreign

jurisdictions, would be subject to this expanded interpretation

of 952(a). Not only is there the obvious marine traffic

between the Mainland and its outlying domestic areas (Hawaii,

Alaska, Puerto Rico, U.S. Virgin Islands, etc.), and the

considerable coastwise traffic in the Atlantic, Pacific, Gulf and

Great Lakes waters which as a matter of course continuously exits

and reenters international waters. There are also hundreds of

thousands of commercial fishermen, as well as those who fish for

sport, who on a daily basis leave domestic waters, enter 

international waters, and return to domestic waters, again

without acquiring contraband in international waters or entering

 -29-

foreign jurisdictions, who would be subject to the contested

interpretation of 952(a). However, contrary to the

government's assertions at oral argument, it does not stop here.

For example, a passenger on a commercial whale-watching vessel

who left Provincetown, Massachusetts, went thirteen miles

offshore into international waters to watch these behemoths, and

then reentered domestic waters would be subject to a charge of

importation if he or she had drugs when he or she originally left

Provincetown. A maritime worker traveling to and from an oil rig

on international waters in the Gulf of Mexico off Louisiana, or

on George's Bank off New England, would be equally exposed. A

sailboat tacking up the coast would engage in an act of

"importation" every time it reentered domestic territory, if it

had contraband aboard when it tacked out of domestic territory.

The height of absurdity,12 however, is that according to the

government's interpretation as expressed at oral argument, the

act of leaving domestic territory would in turn also be 

considered an illegal exportation subject to charge under 

 952(a)'s companion provision, 953(a), even though there was

no intention or act of visiting a foreign territory or off-

loading the exported contraband onto a vessel in international

waters. Thus, under this scenario, a sailboat tacking twenty

times up the East Coast of the United States from Miami to New

York, which had aboard illegal substances acquired in Miami,
  

12 See In re Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643 
(1978) (holding that an absurd result militates against a
proposed statutory interpretation). 

 -30-

would be subject to being charged with twenty violations of

exportation under 953(a), and twenty violations of importation

under 952(a), one for each time it tacked out to and from

international waters.

 As if the above scenarios were not ludicrous enough, at

oral argument, the government also informed us that in the above

situations, since international borders were crossed, border

crossing rules are applicable, with all of the consequent

diminished Fourth Amendment implications such circumstances bring

into play. See United States v. Ram rez, 431 U.S. 606, 616-19 

(1976) (holding that government's right to search all persons and

their belongings who cross its borders is plenary and is

"reasonable" per se within the Fourth Amendment); Carroll v. 

United States, 267 U.S. 132, 153-54 (1925) (stating that border 

searches require no probable cause); see also United States v. 

Montoya de Hern ndez, 473 U.S. 531, 537-38 (1986) ("Routine 

searches of persons and effects of entrants are not subject to

any requirement of reasonable suspicion, probable cause, or

warrant . . .").13 Clearly, the implications of the

government's proposed interpretation go far beyond the mere

crossing of a stretch of water between two points in the same

municipality in Puerto Rico. Cf. Torres v. Puerto Rico, 442 U.S. 

465, 474 (1978) (concluding no international border exists

  

13 Indeed, the Fourth Amendment issues here may be more
troubling than in the land border cases, given the relative lack
of notice upon entering the United States by water versus by
land, since land borders are often marked. 

 -31-

between Puerto Rico and continental United States). A passenger

and his or her belongings on a Boston to Nantucket flight, which

is partially over international waters and airspace, can be

subjected hereafter to a border search upon arrival in Nantucket,

as well as to another such intrusion upon returning to Boston.

In light of these possibilities and in light of the fact that

drug possession statutes already exist to address domestic 

conduct,14 we cannot accept the government's reading of

 952(a). By its interpretation of 952(a), the government has

chosen to ignore a basic rule of statutory interpretation, one

firmly imbedded in the jurisprudence of this Circuit:

"[U]nreasonableness of the result produced by one among

alternative possible interpretations of a statute is [a valid]

reason for rejecting that interpretation in favor of another

which would produce a reasonable result." United States v. 

Bayko, 774 F.2d 516, 522 (1st Cir. 1985) (quoting Sutherland, 

Statutory Construction, 45.12 (4th Ed. 1984)). 

 Furthermore, the undeniable fact is that section 952(a)

has not been used at all in the fashion now promoted by the 

prosecution. On this point, there should be no need to engage in
  

14 These real possibilities are not merely lurking Fourth
Amendment problems to be resolved in future cases. Although
obviously they are not at issue in this case, particularly in
view of the Government's assertions at oral argument, they fall
within the realm of consequences that will follow from the
government's proposed interpretation of section 952(a), and are
valid factors to be considered in determining whether Congress in
enacting that statute intended the result espoused by the
government. Needless to say, the mere possibility is extremely
worrisome as nothing of this sort has ever occurred in the
Nation's history.

 -32-

speculation regarding whether or not there are other uncited or

unreported prosecutions demonstrative of the government's view of

 952(a). At oral argument, the government was specifically

asked to produce evidence of such a prosecution. Nevertheless,

the government has failed to cite even one case in this circuit, 

at any level, reported or otherwise, in which a defendant was

even charged, much less convicted, in the manner now claimed, nor

has our own search revealed the existence of such a case.

 Considering the possibility that the government may not

have prosecuted "small quantities" of drugs transported over

international space from a prior United States connection as

importation under 952(a), but that similarly transported large

amounts have been considered violations of that provision, we

conducted our own search of reported cases. The inquiry revealed

that such a distinction simply does not exist. See, e.g., United 

States v. Marcel, 1995 WL 732747, *1 (2d Cir. 1995) (discussing 

convictions of two co-conspirators who participated in the

transportation of 48 kilograms of cocaine from Puerto Rico to New 

York, but who apparently faced no charge or conviction for

importation); United States v. P rez, 1994 WL 702058, *1-2 

(discussing suppression motion of two co-conspirators arrested

with approximately 30 kilograms of cocaine shortly after arriving 

at John F. Kennedy International Airport aboard a flight from San

Juan; the two defendants faced a two-count indictment that did

not include an importation charge). This court can take judicial

notice of the substantial traffic in narcotics between Puerto

 -33-

Rico and the mainland United States involving large amounts of

contraband. See P rez, at *4 (describing San Juan, Puerto Rico 

as "a location known to [Organized Crime and Drug Enforcement

Task Force] agents to be an active departure point for narcotics

smuggling activities into New York"). Yet, we are unaware of any

case in which the government has in fact charged that

transporting the contraband from Puerto Rico to the mainland (or

vice versa) constituted an importation violation under 952(a).

 Nor is the possibility of such forbearance by the

government from prosecuting such cases in the future very

reassuring. Cf. Donovan v. United States, 114 S. Ct. 873 (1994) 

(in light of Ratzlaf v. United States, 114 S. Ct. 655 (1994), 

vacating and remanding First Circuit case that tried to uphold

the prosecution of defendant pursuant to the money laundering

statute even though defendant's structuring was merely an attempt

to hide money from his wife in a divorce proceeding), vacating 

United States v. Aversa, 984 F.2d 493 (1st Cir. 1993). Although 

prosecutors should perhaps not be faulted for seeking to expand

the limits of the law, courts cannot allow themselves to be

caught up in this euphoria. Rather, they are duty bound to

contain the government within established limits. The

government's actions in not prosecuting such cases up to now are

powerful evidence that Congress did not intend the interpretation

now promoted by the government. Such lengthy non-action should

not be glibly overlooked.

 -34-

 The government also claims that the interpretation set

forth here would inordinately burden prosecutors by adding to

their burden the obligation of identifying and proving the point

of origin of drugs in smuggling operations. However, when a

drug-laden ship coming from an unknown point of origin is shown

to have traversed international waters and brought drugs into the

United States, a jury could presume, without more, that

importation from a place outside the United States has occurred -

- although the precise place from which the drugs emanated is not

established. Cf. Turner v. United States, 396 U.S. 398, 416 

(1970) (approving statutory permissive inference that a person in

possession of heroin is in knowing possession of an imported

narcotic because of the "high probability" that the heroin

originated in a foreign country); see also Ulster County Court v. 

Allen, 442 U.S. 140, 156-57 (1979); Leary v. United States, 395 

U.S. 6, 46-47 (1969). In other words, the government can make

out a prima facie case of importation, within the meaning of 21

U.S.C. 952(a), merely by showing that a ship carrying drugs

from parts unknown has cruised international waters before

entering the United States. Similar inferences would apply to

the case of drugs off-loaded into this country from a mother ship

located within international waters. We therefore hold only that

a defendant can defeat an importation charge by demonstrating

affirmatively by competent evidence that the drugs came into the

United States directly from another place that is also within the

United States. That is the case before us. The charge in the 

 -35-

present case, and the undisputed evidence presented by the 

government is that the drugs were picked up in Mona Island (i.e., 

domestic U.S. territory) and brought to another place within U.S.

domestic territory. The government never made out a prima facie

case that the drugs came from a place outside the United States, 

as the statutory language requires.

 CONCLUSION CONCLUSION

 We affirm defendants' convictions on the possession

counts. We also remand the issues surrounding the firearms

convictions to the original panel for further proceedings in

light of this opinion.

 This en banc decision determines, as a matter of 

statutory interpretation, that the importation statute does not

apply to the shipment in this case from one part of the United

States and its customs territory (Mona Island, Puerto Rico) to

another (the main island of Puerto Rico). We thus reverse the

importation convictions of all three defendants.

 Accordingly, the judgment of the district court is

affirmed in part, remanded in part, and reversed in part. 

 -36-

 CYR, Circuit Judge (concurring). I agree that the CYR, Circuit Judge (concurring). 

importation convictions must be vacated, as ably explained in

Section III.A of Chief Judge Torruella's opinion for the en banc 

court. I write separately because I believe that neither the

majority opinion nor the dissent succeeds in demonstrating that

the opposing result is absurd. Whichever result Congress clearly

chose to require could not have been rejected by the courts as

absurd. Moreover, in my view the interpretation given section

952 by the en banc court reflects greater allegiance to the 

ordinary meaning of the statutory language Congress did use.

 "Dissenting" follows

 -37-

 BOUDIN, Circuit Judge, with whom SELYA and LYNCH, BOUDIN, Circuit Judge, with whom SELYA and LYNCH, 

Circuit Judges, join, dissenting. Dr. Johnson once remarked that Circuit Judges, join, dissenting 

a man may have a reason why 2 plus 2 equals 5 but it will still

equal but 4. The majority has an endless supply of reasons why

the statute does not mean what it says. But the majority's

opinion defies the plain language of the statute; it contradicts

uniform rulings in three other circuits; and it undermines the

purpose and administration of the drug laws. In the majority's

effort, scarcely a major canon of construction escapes damage.

 The evidence showed that the defendants collected 16

kilograms of cocaine hidden on Mona Island, an island under the

jurisdiction of Puerto Rico but physically separated from

mainland Puerto Rico by about 39 miles of water. Assuming a 12-

mile limit for U.S. territorial waters, at least 15 miles of

international waters separate Mona Island from mainland Puerto

Rico. Any ship traveling between Mona Island and mainland Puerto

Rico is unquestionably outside the United States for a good

portion of the trip.

 In this case, the origin of the cocaine is unknown; but

the ship's captain reported that it was part of a larger cache

hidden on Mona Island. In all likelihood, Mona Island is a

transhipment point. Being subject to less surveillance than

mainland Puerto Rico, drugs can be brought to Mona Island in bulk

from foreign origins and then smuggled in smaller quantities to

the Puerto Rico mainland and then to the continental United

States. In all events, the defendants were arrested after their

 -38-

small boat crossed from international waters into U.S. waters

surrounding Puerto Rico.

 The defendants were convicted of various offenses

including violation of 21 U.S.C. 952(a) which prohibits the

importation of specified drugs into the United States. Neither

at trial nor on appeal did the defendants argue that their

conduct fell outside section 952; but at oral argument, the

parties were directed by the original panel to brief the

statutory issue. Subsequently, the panel by a 2-to-1 vote held

that section 952 did not reach the defendants' conduct.

 The panel majority's decision conflicted with a host of

decisions in the Fifth, Ninth and Eleventh Circuits. Not

surprisingly, the full court voted to rehear the case en banc.

What is surprising is that, by a 4-to-3 vote, the en banc court

has now concluded that section 952 does not apply to the

defendants' conduct in bringing 16 kilograms of cocaine from

international waters to mainland Puerto Rico. This result is

wrong, and it does not take a treatise to show why.

 1. "The starting point in statutory interpretation is

'the language [of the statute] itself.'" United States v. James, 

478 U.S. 597, 604 (1986). Section 952(a) says that it is

unlawful "to import [specified drugs] into the United States from

any place outside thereof . . . ." "Import" is given a special 

definition for the illegal drugs subchapter: it is defined to

mean "any bringing in or introduction of such article into any

area . . . ." 21 U.S.C. 951(b). The prohibited area--the

 -39-

United States--is defined to mean "all places and waters,

continental or insular, subject to the jurisdiction of the United

States." 21 U.S.C. 802(28).

 In this case, the defendants brought prohibited drugs

from international waters between Mona Island and mainland Puerto

Rico to within a mile or so of the mainland coastline, a point

that is unquestionably within the United States. The drugs were,

therefore, brought or introduced "into the United States" from

"any place outside thereof," namely, international waters--unless

"any place" has to be a land area or unless "import" has a

specialized meaning excluding drugs first acquired within the

United States.

 The phrase "any place outside thereof" assuredly

includes international waters. See, United States v. Goggin, 853 

F.2d 843, 845 (11th Cir. 1988). If drugs were manufactured on a

ship at sea or found floating on a raft, and were then brought

into shore by motorboat, that would be an importation from a

place outside the United States. The juxtaposition of "places"

and "waters" in section 802(28) was almost surely a precautionary

redundancy. Adding "waters" to "places" avoids the chance that

anyone might mistakenly read "places" to mean only dry land.

 The majority does not deny that international waters

may be a "place" under the statute: it assumes that drugs

acquired from a mother ship at sea might be imported under the

statute; but it says that in this case defendants first acquired

the drugs within the United States, i.e., on Mona Island. But 

 -40-

the statute says nothing about where the defendants first

acquired their drugs. Indeed, drugs "acquired" by a defendant in

the United States but carried abroad can later be illegally re-

imported. E.g., United States v. Friedman, 501 F.2d 1352, 1353- 

54 (9th Cir.), cert. denied, 419 U.S. 1054 (1974) (transit 

through Mexico).

 As for the term "import," absent a statutory definition

the common connotation of foreign-country origin might prevail.

But courts are bound, Coluatti v. Franklin, 439 U.S. 379, 392 

n.10 (1979), by Congress' special definition of "import," 

incorporated into section 952 by section 951(b), defining

"import" in relation to destination, not origin. E.g., United 

States v. Peabody, 626 F.2d 1300, 1301 (5th Cir. 1980). This 

definition applies "whether or not such a bringing in or

introduction constitutes an importation within the meaning of the

tariff laws of the United States." 21 U.S.C. 951(a)(1).

 In a further language argument, the majority suggests

that its reading of section 952 is supported by a comparison of

subsection (a)'s two clauses. The main clause, barring imports

"into the United States," is the core provision whose substance

can be traced back to 1909. The other clause--added in a 1970

recodification of drug laws--covers imports into U.S. customs

territory (the states, the District of Columbia and Puerto Rico)

from any U.S. possession. The majority contends that, on the

government's reading of the main clause, the customs territory

clause is superfluous and has no independent effect.

 -41-

 The origin and purpose of the customs territory clause

are remarkably obscure (it appeared only in certain House bills

and was nowhere explained). But it is fair to think that

smuggling from some U.S. possessions to the states had become a

problem and Congress therefore included language that would

unquestionably cover such shipments. At the time Congress had no

knowledge of precisely how the main clause would be read, and it

certainly had no interest in narrowing the scope of the main

clause by implication.

 In any event, the customs clause is neither superfluous

nor without substantial independent application. It is far from

clear whether carrying drugs aboard a scheduled non-stop airline

flight between two U.S. points could ever be treated as

importation under the main clause; a defendant would certainly

argue that for all practical purposes, drugs on such a flight are

never outside the country. Yet such a flight from a U.S.

possession to U.S. customs territory, say from Guam to Los

Angeles or from the U.S. Virgin Islands to San Juan, could

readily be prosecuted under the customs territory clause. That

geographic content to the customs clause eliminates the

majority's superfluousness argument.

 It is not the government's position, but that of the

majority, that ruptures the superfluousness canon. Under the

special definition of import in section 951(b), Congress

envisaged a kind of transparent curtain around the boundaries of

the United States, and bringing drugs through that curtain is the

 -42-

crime. The majority has effectively repealed and rendered

meaningless Congress' specialized definition, replacing it with a

vernacular definition of import that requires no statutory

definition at all.

 2. The precedents from other circuits, reflecting a

previously uniform application of the statute, all treat the 

introduction of drugs from international waters or international

airspace as a violation of the import statute.15 This has been

the consistent position of the Fifth Circuit, the Ninth Circuit

and the Eleventh Circuit, the three circuits whose area of

jurisdiction includes the entire Pacific and Gulf coasts of the

United States. Until this case, no circuit has taken the 

contrary view.

 For example, in affirming a conviction based on a

shipment intercepted in Florida waters, the Fifth Circuit in

Peabody stated: 

 Had their cargo or contraband originated in,
 say, Texas, that would not alter the fact
 that it was meant to reenter the United
 States from international waters. That is
 enough.

626 F.2d at 1301. In Goggin, the Eleventh Circuit said that it 

was importation to bring cocaine "into the country from

international waters or from airspace in excess of twelve
  

15 See United States v. Peabody, 626 F.2d 1300 (5th Cir. 1980); 
United States v. Phillips, 664 F.2d 971, 1033 (5th Cir. 1981), 
cert. denied, 457 U.S. 1136 (1982); United States v. P rez, 776 
F.2d 797 (9th Cir. 1985); People of Territory of Guam v. 
Sugiyama, 846 F.2d 570, 572 (9th Cir. 1988), cert. denied, 490 
U.S. 1010 (1989); United States v. Lueck, 678 F.2d 895 (11th Cir. 
1982); United States v. Goggin, 853 F.2d 843 (11th Cir. 1988). 

 -43-

geographical miles outward from the coast." Goggin, 843 F.2d at 

845. The Ninth Circuit in P rez likewise deemed "transit through 

international waters" a basis for importation. 776 F.2d at 800-

01.

 Moreover, as the quote from Peabody shows, the circuits 

treat the U.S. origin of the drugs as no defense if the drugs are

removed from the United States and then reintroduced. Similarly,

in United States v. Doyal, 437 F.2d 271, 275, (5th Cir. 1971), 

involving a predecessor to section 952, the court flatly rejected

the defense that the re-imported drugs had originated in the

United States, saying: "[e]ach time the drug was imported into

the United States a violation would occur." See also Friedman, 

501 F.2d at 1354.

 Cases like Peabody and Doyal also underline a major 

fallacy in the majority's opinion, namely, the majority's

assumption that a drug shipment can only come from one "place."

It is evident that the defendants in this case possessed the

drugs both on Mona Island and, thereafter, in international 

waters. But it was from international waters that the defendants

finally "[brought] in or introduc[ed] . . . such articles into"

the United States, 21 U.S.C. 951(b); and reimportation is not a

defense to drug smuggling.

 The present decision actually contradicts precedent in

a fourth circuit as well: In United States v. Nueva, 979 F.2d 

880 (1st Cir. 1992), cert. denied, 113 S. Ct. 1615 (1993), the 

defendants, located in a boat in international waters, retrieved

 -44-

packages of cocaine dropped from a plane. This circuit in Nueva, 

quoting Goggin, ruled that "importation" into the United States 

under section 952 "requires proof that the 'defendant [conspired

to bring] cocaine into the country from international waters or

airspace in excess of twelve geographical miles outward from the

coastline.'" Id. at 884. 

 The majority's answer to all of these cases is that the

decisions of other circuits are ill-reasoned, or that their plain

language--adverse to the dissent--was unnecessary, or both. But

none of the many different judges who participated in these

decisions apparently thought the statute should be read as the

majority reads it. As of today, a major criminal statute means

one thing in the 15 states of the Fifth, Ninth and Eleventh

Circuits; and it means something eccentrically different in four

Northeastern states and Puerto Rico.

 This parade of appellate cases from other circuits is

surely only a sample of similar prosecutions and convictions;

there must certainly be others where, as here, the defendants

were convicted for importing drugs from international waters and

then did not choose to dispute the import charge on appeal. By

themselves, the authorities from three circuits refute the

majority's claim that the government's reading of the statute is

newly minted or at odds with enforcement practices. The only

novelty in this case is the majority's decision.

 3. A final test of statutory meaning is the underlying

purpose of the statute. Borella v. Borden Co., 145 F.2d 63, 64 

 -45-

(2d Cir. 1944) (L. Hand), aff'd, 325 U.S. 679 (1945). Congress' 

interest in protecting U.S. borders echoes through the history of 

the statute. In proposing the legislation, the President's

special message said that the import provisions were intended "to

intercept [drugs] at their point of illegal entry into the United

States," and there are numerous references--by the President,

from law enforcement witnesses, and by legislators--to guarding

the nation's "borders" against drugs.16

 The legislators had no reason to care one whit whether

the drugs were brought from international waters or from a

foreign land, so long as they crossed the U.S. boundary. Indeed,

Congress' indifference to origins is reflected three times over:

in its expressed purpose to protect our "borders," in the

expansive phrase "from any place outside thereof," and in a

companion statute making it unlawful for anyone to possess

prohibited drugs on board a vessel "arriving" in the United

States unless manifested as cargo or official supplies. 21

U.S.C. 955.

 It was irrelevant to Congress' purpose whether the

drugs were originally produced within the United States, as might

matter under a tariff statute designed to protect U.S. markets
  

16 1969 Public Papers of the Presidents of the United States 513 
(Presidential message); Hearings on Legislation to Regulate 
Controlled Dangerous Substances and Amend Narcotics and Drug Laws 
Before the House Ways and Means Committee, 91st Cong., 2d Sess. 
205 (1970) (statement of the Director of the Bureau of Narcotics
and Dangerous Drugs); id. at 322 (statement of Representative 
Pepper).

 -46-

from foreign competition and to favor local producers. In

enacting section 952, Congress was using the border crossing as a

convenient jurisdictional hook on which to catch traffickers.

See Peabody, 626 F.2d at 1301. Thus, the statute is violated 

where drugs are produced within the United States, carried to a

foreign country and then reintroduced into this country. Accord 

Friedman, 501 F.2d at 1353-54; cf. Hearings, supra, at 205 

(reintroduction of drugs after export).

 In smuggling operations a boat arriving from

international waters, or a small plane from international

airspace, often comes from an unknown point of origin. If one

added to the government's burden of proof the obligation to show

the point of origin, time would be spent by courts and parties on

an issue wholly irrelevant to Congress' concern to exclude drugs.

In many cases, the government would win; in some it might lose.

Such proof serves no purpose except to waste time, squander law

enforcement and judicial resources, and cause occasional erratic

acquittals of drug importers.

 To suggest that Congress could not have intended the

statute to apply, the majority summons up visions of federal

agents arresting day sailors or airline passengers transiting

from one U.S. point to another with a few joints of marijuana on

board. But such dubious results are not avoided by distorting

the statute: a day hiker with a few joints who strayed over the

border to Canada and then back again or a tourist with a few

 -47-

joints returning from London by plane would be importing by any

definition.

 More to the point, there is no record of prosecutorial

abuse of section 952. Indeed, the majority twists this fact into

a claim that the government's interpretation must therefore be a

radical change in position, but the majority has confused two

different points. The government has not abused the statute by

applying it to trivial amounts for personal use; but it has

applied it to major drug shipments arriving from international

waters or international air space. As the precedents show, it

has been upheld in every reported case.

 The courts are capable of warding off unjust results,

if and when they arise. E.g., United States v. Aversa, 984 F.2d 

493 (1st Cir. 1993), vacated, 114 S. Ct. 873 (1994). But such 

surgery is properly done with a scalpel rather than an axe, and

there is no cause for any surgery here. In this case, the 

defendants were not day sailors or tourists; they were importing

16 kilograms of cocaine into Puerto Rico after a substantial trip

through international waters. They fall squarely within the

purpose, as well as the plain language, of section 952. The rule

of lenity has nothing to do with such a case.

 To conclude: The majority opinion is not short of

"reasons" for its result; after many pages of argument, one

emerges half-dazed from the labyrinth of explanations. But

nothing the majority says can overcome a single phrase in the

statute--section 951(b)'s definition of "import" as "any bringing

 -48-

in or introduction" of drugs into the United States. That is

what the defendants did in this case, and that is why their

convictions under section 952 should be affirmed.

 -49-